The WASHINGTON STAR
COMPANY, Appellant,

v.

INTERNATIONAL TYPOGRAPHICAL
UNION NEGOTIATED
PENSION PLAN.

No. 83–1313.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1984.

Decided March 27, 1984.

Court, for appellee. Robert J. Connerton and James S. Ray, Washington, D.C., were on the brief, for appellee.

Terence G. Craig, Washington, D.C., with whom Baruch A. Fellner and Peter H. Gould, Washington, D.C., were on the brief, for amicus curiae Pension Benefit Guaranty Corp., urging affirmance.

Before WRIGHT, MIKVA and ED-WARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge.

This case is an appeal from a decision of the District Court, 582 F.Supp. 301, upholding the constitutionality of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. No. 96–364, 94 Stat. 1208 (codified in scattered sections of 5, 26 & 29 U.S.C.).[1] The Washington Star Company (the "Star"), against whom withdrawal liability has been assessed by the International Typographical Union Negotiated Pension Plan (the "Plan"), challenges the MPPAA provisions on the grounds that they violate substantive and procedural due process and the right to trial by jury. We conclude that these challenges are without merit. Accordingly, we affirm the judgment of the District Court.

## I. BACKGROUND

### A. The MPPAA Withdrawal Liability Provisions

The Multiemployer Pension Plan Amendments Act of 1980 is the product of exten-

Betty Leach, Washington, D.C., with whom Lawrence D. Levien, Washington, D.C., was on brief, for appellant.

James F. Gill, Fairborn, Ohio, of the Bar of the U.S. Court of Appeals for the Second Circuit, pro hac vice by special leave of the

---

1. The constitutionality of these provisions is currently the subject of extensive nationwide litigation. The Ninth Circuit has held on substantive due process grounds that the provisions are unconstitutional as applied to employers who withdrew from multiemployer pension plans between the MPPAA's retroactive effective date and its enactment date. *Shelter Framing Corp. v. Pension Benefit Guaranty Corp.*, 705 F.2d 1502 (9th Cir.), *prob. juris. noted*, — U.S. ——, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983). The Ninth Circuit, however, expressed no opinion as to the constitutionality of the imposition of liability on employers who withdrew after the en-

actment date. 705 F.2d at 1514–15. The Second, Fourth and Seventh Circuits have upheld the provisions as applied to withdrawals occurring both before and after the date of enactment. *See Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843 (2d Cir.1984); *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247 (7th Cir.1983); *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628 (4th Cir.1983). The present case involves a challenge to the provisions only as applied to a withdrawal occurring after the date of enactment.

sive congressional study of and experimentation with the regulation of the nation's private pension system. The Act's withdrawal liability provisions were enacted because Congress determined that the existing regulatory framework created by the Employee Retirement Income Security Act of 1974 ("ERISA") not only was inadequate to deal with the special problems of multiemployer pension plans, but actually contributed to the financial distress of such plans by creating incentives for employer withdrawals and eventual plan terminations.

ERISA, the first significant attempt at comprehensive federal regulation of private pension plans, was the product of almost a decade of study. One problem Congress identified during the course of that study was that terminations of pension plans had deprived employees of anticipated retirement benefits. To remedy this problem, Congress established a termination insurance program in title IV of ERISA. The program is administered by the Pension Benefit Guaranty Corporation ("PBGC"), an independent corporation established within the Department of Labor. In the event a covered plan terminates with insufficient assets to pay vested pension benefits, the PBGC guarantees those benefits up to specified levels. The PBGC receives no appropriations from general revenues, but finances the termination insurance program with premiums paid by covered plans.

Single employer plan benefits were insured unconditionally upon the enactment of ERISA. Multiemployer plan benefits, however, were guaranteed solely at the discretion of the PBGC until January 1, 1978, at which time the guarantees were to become mandatory. Multiemployer plans are plans maintained pursuant to one or more collective bargaining agreements that cover the employees of two or more employers. The employers normally agree to contribute at rates specified in the agreements. Contributions are made to a pooled fund administered by a board of trustees composed equally of employer-designated and union-designated trustees. The trus-

tees normally have the authority to manage the assets of the plan and to set eligibility requirements and benefit levels. Under title IV as enacted in 1974, an employer who withdrew from a multiemployer plan had no further responsibility to the plan unless the plan terminated within five years. If the plan did terminate within that period and lacked sufficient funds to pay all vested benefits, and if the PBGC elected to pay the unfunded guaranteed benefits to the plan's beneficiaries, then the employer became liable to the PBGC for the employer's share of the guaranteed benefits, up to a maximum of 30% of the employer's net worth.

Concerned about the potential cost of extending mandatory benefit insurance to multiemployer plans and recognizing the need for further study, Congress four times extended the commencement date of the mandatory guarantee program and ordered the PBGC to prepare a comprehensive report analyzing the multiemployer situation. The PBGC concluded that the cost of insuring all plan benefits would be unacceptably high. The PBGC also argued that mandatory termination insurance would create further incentives for plan termination. The House Education and Labor Committee agreed with this assessment:

> Under the existing termination insurance rules, guarantees are provided by the PBGC to participants in a terminated plan. Guarantee levels are high enough to result in coverage of virtually 100 percent of the vested benefits of participants in certain multiemployer plans. Employers who withdraw from a multiemployer plan more than five years before termination have no further obligation to fund the liabilities of the plan, while employers who remain with a plan until it terminates, or withdraw within five years of termination, are liable to the PBGC for unfunded guaranteed benefits up to 30 percent of net worth.

> In the case of a financially troubled plan, termination liability creates an additional incentive for employers to withdraw early. In such a plan, contribution

increases may be escalating so sharply that termination liability may prove cheaper than continuing the plan. The remaining employers have an incentive to terminate the plan. Where active employees determine that benefits may be provided for them at considerably less cost than current contributions and are satisfied that vested benefits for retirees and others are virtually 100 percent covered by the guarantees, there is an incentive for the union to agree to terminate the plan. The result is to transfer the cost of providing benefits to the insurance system. The current termination insurance provisions of ERISA thus threaten the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and termination of plans in financial distress.

H.R. REP.No. 869, Part I, 96th Cong., 2d Sess. 54–55 (1980). The House Ways and Means Committee expressed similar views. *See* H.R. REP.No. 869, Part II, 96th Cong., 2d Sess. 15 (1980), U.S.Code Cong. & Admin.News, pp. 2918, 2922.

The withdrawal liability provisions of the MPPAA are a central part of the solution adopted by Congress to protect the benefit security of participants in multiemployer pension plans and encourage the maintenance and growth of such plans. Under the MPPAA, an employer who withdraws from an on-going multiemployer plan no longer incurs merely a limited contingent liability payable to the PBGC. Rather, the withdrawing employer incurs an immediate liability for a reasonable share of the plan's unfunded vested benefits. *See* 29 U.S.C. § 1381 (Supp. V 1981). When such withdrawal occurs, it is the duty of the plan to determine the amount of the employer's withdrawal liability, notify the employer of the amount, and collect it. *Id.* § 1382.

The MPPAA describes a variety of methods by which a plan may calculate the amount owed by a withdrawing employer. *See* 29 U.S.C. § 1391 (Supp. V 1981). *See generally* Cummings & Kershaw, *Withdrawal Liability Under the Multiemploy-er Pension Plan Amendments Act of 1980*, 40 N.Y.U. INST. ON FED. TAX'N § 12.-02[6] (ERISA Supp.1982). All methods involve allocating the plan's unfunded vested benefits ("UVB") among contributing employers. The UVB is the actuarial present value of all nonforfeitable benefits under the plan minus the value of the plan's assets. The Act requires that plans, in calculating the UVB, use actuarial assumptions and methods that "in the aggregate, are reasonable" and that "in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1) (Supp. V 1981). Under the allocation method used by the Plan in the present case, a withdrawing employer's liability is derived basically by multiplying the plan's UVB by a fraction. The numerator of this fraction is the sum of all contributions required to have been made by the withdrawing employer during the previous five years. The denominator is the sum of all contributions made by all the contributing employers during this same period.

If the employer disputes the plan's determinations, either the employer or the plan may initiate an arbitration proceeding. 29 U.S.C. § 1401(a)(1) (Supp. V 1981). If neither party does so, the withdrawal liability is due and owing, and the plan may sue for collection. *Id.* § 1401(b)(1). If either party elects arbitration, the MPPAA instructs the arbitrator to presume that the plan's determinations are correct, unless the employer shows by a preponderance of the evidence that a challenged determination was "unreasonable or clearly erroneous." *Id.* § 1401(a)(3)(A). Either party may bring an action in a federal district court "to enforce, vacate, or modify" the arbitrator's award. *Id.* § 1401(b)(2). The court must enforce the arbitrator's decision in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1–14 (1982), which authorizes only limited review. *Id.* § 1401(b)(3). Furthermore, the court must presume that the arbitrator's findings of fact are correct, unless they are rebutted by a clear preponderance of the evidence. *Id.* § 1401(c).

B. *The Facts of the Present Case*

The multiemployer pension plan involved in the present case is the International Typographical Union Negotiated Pension Plan. The Star was a party to a collective bargaining agreement with the Columbia Typographical Union, a local of the International Typographical Union ("ITU"), which required it to contribute to the Plan $2.20 per shift worked by each ITU-represented employee. The Star made all such required contributions. On August 7, 1981, however, the Star ceased publication because of financial difficulties and dismissed all of its ITU-covered employees.

Subsequently, on August 21, 1981, the Plan notified the Star that it was required under the MPPAA to pay withdrawal liability totalling $525,987.00. The Star neither disputed the withdrawal liability nor requested arbitration. The Star made its first two quarterly payments of withdrawal liability but withheld the third payment, which was due on April 20, 1982. On or about May 4, 1982, the Star advised the Plan that it considered the MPPAA unconstitutional. On June 8, 1982, the Star commenced this action seeking a declaratory judgment that the MPPAA withdrawal liability provisions violate the substantive and procedural due process guarantees of the Fifth Amendment and the jury trial guarantee of the Seventh Amendment. On February 9, 1983, the District Court granted summary judgment for the Plan, holding that the MPPAA withdrawal liability provisions withstand the Star's constitutional challenges.

## II. ANALYSIS

A. *Substantive Due Process*

The Star argues that the withdrawal liability provisions of the MPPAA violate the Due Process Clause of the Fifth Amendment because of the retroactive effect they have on pre-existing contractual arrangements. As a threshold matter, we must determine the appropriate standard of review to apply. *See Duke Power Co. v. Carolina Environmental Study Group,*

*Inc.,* 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).

### 1. *Contract Clause Analysis*

The Star argues that Contract Clause principles are embodied in the Due Process Clause of the Fifth Amendment and are therefore appropriately applied in analyzing this case. Accordingly, the Star would have us follow *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), in which the Supreme Court invalidated a Minnesota pension statute on the basis of the Contract Clause. The Minnesota statute required an employer who closed its office in the State to pay a "pension funding charge" if its pension fund was insufficient to provide full benefits for all employees who had worked for the company for at least ten years, even if the employees' pensions had not yet vested under applicable contracts. The Court found that this statute substantially altered Allied Structural Steel's contractual relationships with its employees "by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake." 438 U.S. at 240, 98 S.Ct. at 2720. The Court held that the level of scrutiny under the Contract Clause depends on the severity of the impairment of the contractual relationship, *id.* at 245, 98 S.Ct. at 2723, and that a statute, such as the Minnesota pension statute, that produces a severe disruption of contractual expectations can withstand scrutiny only if shown to be "necessary to meet an important general social problem," *id.* at 247, 98 S.Ct. at 2724.

The Star argues that the MPPAA is analogous to the Minnesota pension statute invalidated in *Allied Structural Steel.* Under this analysis, the Star contends that the applicable collective bargaining and trust agreements, which were already in existence at the time of the MPPAA's enactment, imposed no pension liability on the Star other than payment of negotiated contributions to the Plan. Thus, according to the Star, the MPPAA withdrawal liability provisions impose an impermissible additional obligation on the employer.

■ In our view, the MPPAA appears to be readily distinguishable from the Minnesota pension statute as legislation "necessary to meet an important general social problem."[2] We need not actually make this determination, however, because we reject the Star's contention that Contract Clause analysis has any applicability to this case. Article I, section 10, clause 1 of the Constitution provides that "[n]o *State* shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts ...." U.S. CONST. art. I, § 10, cl. 1 (emphasis added). Thus, the Contract Clause by its terms applies only to state, not federal, enactments. Furthermore, Article I, section 9, clause 3, of the Constitution expressly prohibits *Congress* from passing bills of attainder and ex post facto laws, but does not include a parallel prohibition against congressional laws impairing the obligation of contracts. As history reminds us, this omission was no oversight:

> Mr. GERRY entered into observations inculcating the importance of public faith, and the propriety of the restraint put on the states from impairing the obligation of contracts; alleging that Congress ought to be laid under the like prohibitions. He made a motion to that effect. He was not seconded.

5 ELLIOT'S DEBATES 546 (2d ed. 1845). The Framers thus consciously decided not to make Contract Clause strictures applicable to the federal government.

■ Notwithstanding the foregoing points, the Star argues that the Due Process Clause of the Fifth Amendment should be construed to incorporate a Contract Clause comparable to that found in Article I, section 10, clause 1. The Star, however, cites no meaningful support for this proposition in the history of the Constitution or in the opinions of the Supreme Court.[3] In the absence of any such support, there can be no doubt that we must reject the Star's contention that the Due Process Clause of the Fifth Amendment makes the constraints of the Contract Clause applicable to review of congressional legislation.

### 2. *The* Nachman *Test*

■ The Star alternatively argues that we should find the MPPAA withdrawal liability provisions unconstitutional under a four factor test developed by the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947 (7th Cir.1979), *cert. denied on constitutional grounds*, 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979), *aff'd on statutory grounds*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In *Nachman*, the Seventh Circuit rejected a substantive due process challenge to the ERISA termination liability rules for *single*-employer plans. Under those rules, an employer who terminates an underfunded pension plan is required to reimburse the PBGC for amounts paid to its employees from the PBGC pension insurance program, up to a maximum of 30% of the employer's net worth. The rules effectively superseded the terms in Nachman's collective bargaining agreement providing that, in the event of termination, the plan would pay benefits only to the extent of its assets without liability on the part of Nachman for vested but unfunded benefits.

---

**2.** The Supreme Court recently noted that the Minnesota pension statute "had a very narrow focus: it was aimed at specific employers. Indeed, it even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 705 n. 13, 74 L.Ed.2d 569 (1983).

**3.** The Star cites *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241 n. 12, 98 S.Ct. 2716, 2720 n. 12, 57 L.Ed.2d 727 (1978), wherein the Court merely noted, in the context of discussing the history of the use of the Contract Clause as a check on state legislation, that "at least one commentator has suggested that 'the results might be the same if the contract clause were dropped out of the Constitution, and the challenged statutes all judged as reasonable or unreasonable deprivations of property.' Hale, The Supreme Court and the Contract Clause: III, 57 Harv.L.Rev. 852, 890–891 (1944)." This passing reference surely cannot be taken as legitimate support for the analysis urged upon us by the Star.

In analyzing the ERISA termination liability rules, the court in *Nachman* did not actually decide what standard of review applies. *See* 592 F.2d at 959. Rather, the court held that *even if* the heightened scrutiny employed under the Contract Clause applies, the ERISA termination liability rules are constitutional. *See id.* The court then attempted to synthesize Supreme Court decisions involving substantive due process and the Contract Clause, and isolated four factors to be considered in evaluating the rationality of legislation that retroactively imposes economic burdens: (1) the reliance interests of the parties affected; (2) whether the impairment of the private interest is effected in an area previously subjected to regulatory control; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens.[4] *Id.* at 960. The *Nachman* court noted that "[i]t must be emphasized that although these factors might improperly be used to express merely judicial approval or disapproval of the balance struck by Congress, they must only be used to determine whether the legislation represents a rational means to a legitimate end." *Id.* (footnote omitted).

We reject the *Nachman* test for two reasons. First, we find the test to be inconsistent with the long-settled standard of review of congressional legislation addressing economic and social problems. Under that standard, courts are not free to engage in searching scrutiny of Congress' balancing of "the reliance interests of the parties affected" and "the equities of imposing the legislative burdens." Even a statute that "may exact a needless, wasteful requirement in many cases"[5]—in other words, one devoid of "statutory provisions designed to limit and moderate the impact of the burdens"[6]—is not for that reason unconstitutional under the Due Process Clause. Rather, "it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement.... It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."[7] The *Nachman* court offers no justification for imposing an abnormally high level of scrutiny on congressional legislation merely because it affects contract-based expectations. Legislation adjusting the benefits and burdens of economic life frequently will upset settled expectations; nonetheless, such expectations, whether created by pre-existing law or by contract, are subject to the exercise of congressional power.

Second, we reject the *Nachman* test because it provides no standards other than "mere[ ] judicial approval or disapproval of the balance struck by Congress"[8] to guide courts in their review. Although *Nachman* admittedly includes a brief warning note about the potential hazards of its four factor test, we find these words of caution to be illusory. The four factors are sweeping, relatively unweighted, highly malleable and, thus, easily manipulatable. Therefore, under the test, judges are vested with virtually unrestricted discretion to strike down economic and social legislation that fails to conform to their own views. For example, the first *Nachman* factor invites judges to substitute their views for Congress' concerning the weights that should attach to employees' reliance on receiving vested pension benefits and to employers' reliance on contractual limitations on their

---

**4.** The Seventh Circuit itself rejected the *Nachman* test in *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1263 (7th Cir.1983), holding that the constitutionality of the MPPAA must be determined under the traditional "arbitrary and irrational" test. Nevertheless, the *Peick* court determined that even if the stricter Contract Clause analysis used in *Nachman* were applicable, the withdrawal liability provisions of the MPPAA would survive scrutiny. *Peick,* 724 F.2d at 1270.

**5.** *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

**6.** *Nachman,* 592 F.2d at 960.

**7.** *Williamson,* 348 U.S. at 487–88, 75 S.Ct. at 464–465.

**8.** *Nachman,* 592 F.2d at 960.

pension liability. Not surprisingly, the judicial opinions seeking to apply this factor have reached hopelessly inconsistent results, obviously born of unrestrained exercises of discretion.[9] Such discretion is incompatible with our constitutional system:

> Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy.... We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.

*Ferguson v. Skrupa,* 372 U.S. 726, 729–30, 83 S.Ct. 1028, 1030–1031, 10 L.Ed.2d 93 (1963).

### 3. *The Rationality Standard*

We conclude that the traditional standard of review applies in this case:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, *e.g., Ferguson v. Skrupa,* 372 U.S. 726 [83 S.Ct. 1028, 10 L.Ed.2d 93] (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–488 [75 S.Ct. 461, 464–465, 99 L.Ed. 563] (1955).

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *accord Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).

Our analysis of the present case relies principally on the Supreme Court's decision in *Turner Elkhorn,* upholding provisions of title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, that require coal mine operators to pay black lung benefits to miners who left employment in the industry before the effective date of the Act, and to the survivors of such miners. The mine operators argued that these provisions violate due process by charging them with an unexpected liability for past, completed acts. The Court noted that the provisions are not unconstitutional merely because they impose a new liability based on past acts, but that "[t]he retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." 428 U.S. at 17, 96 S.Ct. at 2893. The Court concluded that "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." *Id.* at 18, 96 S.Ct. at 2893. The Court distinguished the portion of *Railroad Retirement Board v. Alton Railroad Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), that invalidated as arbitrary a provision in the Railroad Retirement Act of 1934 providing for employer-financed pensions for former employees

---

**9.** *Compare Shelter Framing Corp. v. Pension Benefit Guaranty Corp.,* 705 F.2d 1502, 1511 (9th Cir.) ("The law here operates to the severe detriment of the employers, and we believe their reliance on the prior law to be the most relevant reliance interest to be considered."), *prob. juris. noted,* —— U.S. ——, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983), *with Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 638 (4th Cir.1983) ("We have no doubt of the heavy weight to be given to employees' reliance on ultimate realization of their vested benefits. Conversely, Republic's re-

liance on its unqualified right to withdraw from a multiemployer pension plan is not as weighty."), *and Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1271–72 (7th Cir.1983) ("The employers' side of the reliance balance is also important, but we find it to be less compelling than that of the employees."), *and Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843 at 851 (2d Cir.1984) ("In sum, we believe that the reliance interest of the employees was greater than the interest of the employers and therefore this first factor favors the retroactive application of the statute.").

who, though not in the employ of the railroads at the time of enactment, had been so employed within the year.[10] That provision required the railroads to make additional payments to workers who had already been fully compensated for their services, in contrast to the provisions in *Turner Elkhorn*, which "allocate to the mine operator an actual, measurable cost of his business." 428 U.S. at 19, 96 S.Ct. at 2894.

■ Like the provisions upheld in *Turner Elkhorn*, the MPPAA withdrawal provisions at issue in the present case are a rational means of allocating among a group of employers the collective burden of ensuring that their employees receive full compensation. Part of the total employment compensation paid to employees covered by multiemployer pension plans is the entitlement to pension benefits upon satisfaction of vesting requirements. It is true that employers under a multiemployer pension plan expressly agree only to make negotiated contributions. Nevertheless, we do not consider it at all irrational for Congress to impose liability for a plan's unfunded vested benefits collectively on employers who have profited from employees' services that were provided in part in exchange for an entitlement to those vested benefits.

■ The Star argues that the MPPAA unfairly allocates liability for a plan's unfunded vested benefits among the individual employers who have contributed to the plan. Due process, however, leaves Congress with considerable flexibility in determining how to spread the cost of ensuring the retirement security of participants in multiemployer plans. As the Supreme Court noted in *Turner Elkhorn*, "[i]t is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." 428 U.S. at 19, 96 S.Ct. at 2894.

The cost allocation problem addressed by the MPPAA is one of enormous difficulty. Not even the total amount of a plan's underfunding is known until the plan terminates or becomes insolvent. It is clearly rational, however, to assess and begin to collect an individual employer's liability immediately at the time of its withdrawal, even though the plan itself may be on-going. The Star specifically criticizes Congress' solution to the problem of cost assessment and allocation on the ground that it imposes liability for the large accumulations of pre-MPPAA underfunding only upon the group of employers who were contributing to multiemployer plans as of April 29, 1980. Employers who withdrew from multiemployer plans before that date are assessed no liability. Employers who did not begin contributing to a plan until after that date are liable only for their proportionate share of the changes in unfunded vested liability during each plan year in which they contribute. But Congress clearly had a rationale for choosing the solution it did. Congress could not have imposed liability on employers who withdrew before April 29, 1980, without substantially increasing the MPPAA's retroactive effect. And Congress could not have imposed liability for pre-MPPAA underfunding on employers who began contributing to a plan subsequent to the enactment of the MPPAA without discouraging new entrants to multiemployer plans and thus defeating the MPPAA's purpose.

The Star also criticizes the MPPAA withdrawal liability rules because they allegedly levy an assessment upon a withdrawing employer that may exceed the value of its own employees' unfunded benefits. The Star's argument that the MPPAA provisions are unconstitutional because they do not base liability precisely on past employment relationships is curiously at odds with the argument made by the mine operators in *Turner Elkhorn* that "the Act spreads costs in an arbitrary and irrational manner

---

**10.** The Court merely assumed, *arguendo,* that this portion of *Alton Railroad* retains vitality.

428 U.S. at 19, 96 S.Ct. at 2894.

by basing liability upon past employment relationships, rather than taxing all coal mine operators presently in business." 428 U.S. at 18, 96 S.Ct. at 2893. Neither of these arguments, however, is of "constitutional dimension": as the Court noted in *Turner Elkhorn*, "it is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators, including new entrants and farsighted early operators who might have taken steps to minimize black lung dangers, or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health." 428 U.S. at 18, 96 S.Ct. at 2894.

In summary, the MPPAA withdrawal liability provisions are rational both in imposing collective liability for a multiemployer pension plan's unfunded vested benefits upon the employers who have contributed to the plan and in the manner in which they allocate that liability among the individual employers. Accordingly, the provisions satisfy the requirements of substantive due process.

### B. *Procedural Issues*

The Star also challenges the constitutionality of the MPPAA on the grounds that it denies employers their due process right to impartial adjudication and their right to trial by jury. For substantially the reasons given by the Fourth Circuit in *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 639–42 (4th Cir.1983), we find these challenges to be without merit.[11] Although the initial determination of the amount of withdrawal liability is made by the plan trustees who are under a fiduciary duty to act solely in the interest of the plan's participants and beneficiaries, *see* 29 U.S.C. § 1104(a)(1) (1976 & Supp. V 1981); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), the trustees have no inherent bias or duty to maximize the employer's withdrawal liability. The legislative history of the MPPAA makes it clear that "in choosing the rules that would eliminate or reduce liability, the choice of such a rule is not *per se* a violation of a [sic] fiduciary standards; the determination must be made as to whether the fiduciary has acted reasonably and in the interests of plan participants and beneficiaries and otherwise in accordance with the fiduciary standards." H.R. REP. No. 869, Part I, 96th Cong., 2d Sess. 67 (1980), U.S.Code Cong. & Admin. News, p. 2935. We conclude that the trustees' fiduciary duties require them to act neutrally and reasonably in making withdrawal liability determinations. Furthermore, we interpret the presumptions under the MPPAA, in favor of a plan's withdrawal liability assessments, not to insulate the trustees' determinations from effective review, but rather to require the trustees affirmatively to provide some support for the reasonableness of their determinations in the event that the employer introduces evidence to the contrary. Finally, the MPPAA's procedures do not violate the employers' right to trial by jury, because those procedures are a proper exercise of Congress' power to delegate factfinding functions to administrative-type bodies in cases involving public rights. *See Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

### CONCLUSION

We conclude that the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 do not violate substantive or procedural due process or the right to trial by jury. Accordingly, the judgment of the District Court is

*Affirmed.*

---

**11.** *Accord Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843 at 854–855 (2d Cir.1984); *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1277 (7th Cir.1983). The Ninth Circuit in *Shelter Framing Corp. v. Pension Benefit Guaranty Corp.*, 705 F.2d 1502 (9th Cir.), *prob. juris. noted,* —— U.S. ——, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983), did not address these procedural issues.