**BOARD OF TRUSTEES OF the WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, Plaintiff-Appellee,**

v.

**THOMPSON BUILDING MATERIALS, INCORPORATED, a California Corporation, Defendant-Appellant.**

No. 83–5893.

United States Court of Appeals, Ninth Circuit.

Submitted * May 9, 1984.

Decided Dec. 27, 1984.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R. App.P. 34(a) and Ninth Circuit rule 3(f).

Kirke M. Hasson, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff-appellee.

David P. Strauss, Law offices of Roger A. Saevig, Irvine, Cal., Herbert A. Moss, Santa Ana, Cal., for defendant-appellant.

Before HUG[**], TANG and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Thompson Building Materials, Inc. (Thompson), appeals summary judgment by the district court in an action under the Multiemployer Pension Plan Amendments Act of 1980. The court held that Thompson was liable to the Western Conference of Teamsters Pension Fund (the Fund) for $103,156.52 in withdrawal liabilities, and for additional amounts in interest, liquidated damages and costs.

Thompson mounts a broad constitutional attack on the Act's statutory withdrawal liability provisions, contending that the Act is unconstitutional on grounds that it (1) impairs contractual obligations, (2) denies Thompson an impartial tribunal, (3) denies a meaningful hearing, (4) denies access to the courts, and (5) constitutes a taking without compensation. Thompson also argues for an exception to withdrawal liability where an employer's withdrawal is involuntary and caused by the union.

We reject Thompson's constitutional challenges to the statute and its argument for an exception, and affirm the district court's ruling.

### Statutory Background

Title IV of the Employment Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. §§ 1301 *et seq.*, established a system of insurance to protect employees' interests in accrued pension benefits in the event that their pension plan failed or terminated with insufficient funds. The program is administered by the Pension Benefit Guarantee Corporation (PBGC), a governmental entity, and is funded by premium payments from the pension plans. 29 U.S.C. § 1306.

As originally enacted, ERISA allowed the PBGC, in its discretion, to underwrite certain nonforfeitable benefits if a terminating multiemployer plan lacked sufficient funds. 29 U.S.C. § 1361.[1] The PBGC could recover amounts it expended in proportionate shares from the employers, provided certain contingencies were met. Specifically, liability was dependent upon the PBGC's decision to exercise its discretion to make the expenditure and upon the employer's having contributed to the fund within the five year period immediately preceding termination. In addition, no individual employer's liability could exceed thirty percent of that employer's net worth. 29 U.S.C. § 1364.

In 1980, Congress enacted the Multiemployer Pension Plan Amendments Act (MPPAA), Pub.L. No. 96-364, 94 Stat. 1208 (1980) in response to the PBGC's advice that the contingent liability provisions of ERISA gave employers an incentive to withdraw from multiemployer plans. The MPPAA required withdrawing employers to pay to the multiemployer fund a proportionate share of the fund's "unfunded vested benefit liability." 29 U.S.C. § 1381. The "unfunded vested benefit liability" measures the shortfall in the fund's assets. The fund's "vested benefit liability" is the actuarial present cash value of all of the benefits that have vested. If the pension fund has insufficient assets to cover its vested benefit liability, the difference between the assets and the liability is the "unfunded vested benefit liability."

The fund's trustees have initial responsibility to determine the employer's allocable share of the unfunded vested benefit liability and to collect the amounts due. 29 U.S.C. § 1382. The Act sets out several different methods of calculating the withdrawal liability, 29 U.S.C. § 1391, and also allows the trustees, with PBGC approval, to design their own methods, 29 U.S.C. § 1391(c)(5)(A). Disputes between the employer and the trustees regarding the amounts assessed must be resolved initially

---

[**] Judge Hug was chosen to replace Judge Ely on the panel, following the death of Judge Ely.

[1] In contrast, single employer plan benefits were insured unconditionally upon enactment.

by arbitration. 29 U.S.C. § 1401(a)(1). In the arbitration proceedings, the trustees' calculations are presumed correct, unless the employer shows by a preponderance of the evidence "that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The arbitrator's award in turn is subject to review by the courts, 29 U.S.C. § 1401(b)(2), although the arbitrator's findings of fact are presumed correct unless rebutted by a clear preponderance of the evidence, 29 U.S.C. § 1401(c).

## FACTS

The essential facts are undisputed. Prior to December 2, 1980, Thompson participated in the Western Conference of Teamsters Pension Plan (the Plan) and was required to contribute to the Fund on behalf of its employees. On December 2, Thompson ceased its contributions, allegedly because Teamsters Local 952 notified Thompson that it disclaimed any further interest in representing Thompson's employees.[2] Thompson argues that continued contributions to the Fund would have violated 29 U.S.C. § 186(c)(5).[3]

The Fund notified Thompson that Thompson was liable for $103,156.53 as its portion of the Fund's unfunded vested benefit liability. Thompson demanded arbitration of its liability to the Fund, but did not request a reconsideration by the Fund of its calculations or take the other steps required by the Act to initiate arbitration.[4] Despite a subsequent notice by the Fund, Thompson failed to pay the assessed liability, and the Fund brought this action under

29 U.S.C. § 1401(b)(1) to collect the amounts owing. The district court granted the Fund summary judgment.

On appeal, Thompson challenges the constitutionality of the MPPAA's withdrawal liability provisions. Thompson also argues that the courts should establish an exception to such liability where the employer's withdrawal was involuntary and caused by union action.

## DISCUSSION

### I. Constitutionality of the MPPAA

This is the second time that the question of the MPPAA's constitutionality has come before this court. In *Shelter Framing Corp. v. Pension Benefit Guaranty Corp.*, 705 F.2d 1502 (9th Cir.1983), *vacated and remanded sub nom., Carpenters Pension Trust v. Shelter Framing,* —— U.S. ——, 104 S.Ct. 3550, 82 L.Ed.2d 853 (1984), a panel of this court held unconstitutional a provision of the MPPAA that imposed withdrawal liability retroactively on employers who withdrew from multiemployer pensions prior to passage of the Act. The Supreme Court subsequently vacated our decision in *Shelter Framing* and remanded for reconsideration in light of the Court's decision in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), in which the Court upheld as constitutional the retroactive provisions that this court had held invalid in *Shelter Framing.* Both *R.A. Gray* and *Shelter Framing*, however, expressly limited their holdings to the retroactive provisions of the Act. *See R.A.*

---

**2.** The record contains a copy of a letter from the Union's attorney and a Union notice, both stating the disclaimer without elaboration. The parties' briefs and the record are unilluminative of the reason the Teamsters issued the disclaimer.

**3.** Section 186, a portion of the Taft-Hartley Act, generally prohibits payments by employers to employee representatives. 29 U.S.C. § 186(a). Section 186(c)(5) carves out an exception for payments to certain pension funds jointly administered by the employer and the representative union.

**4.** 29 U.S.C. § 1401(b)(1) provides that if neither party initiates arbitration, the amounts assessed

by the trustees become "due and owing." As a prerequisite to initiating arbitration, the employer first must request the trustees to review their calculations. 29 U.S.C. § 1401(a)(1)(B). This request must occur within ninety days after the trustees notify the employer of the withdrawal liability. 29 U.S.C. § 1399(b)(2)(A). The same section invites the employer to identify any inaccuracies in the trustees' determinations and to provide additional relevant information to the trustees. *Id.* Despite a notice by the Fund outlining these procedures, Thompson failed to request the trustees to review their calculations.

*Gray,* 104 S.Ct. at 2717 n. 7; *Shelter Framing,* 705 F.2d at 1514–15. Thompson's withdrawal in the instant case occurred on December 2, 1980, subsequent to enactment of the MPPAA, and consequently *R.A. Gray* is not controlling.

We also note that several other circuits have addressed most of the constitutional arguments Thompson raises and with one exception have upheld the Act against constitutional attack. *See The Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502 (D.C.Cir.1984) (hereinafter *The Washington Star* ); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984) (hereinafter *Standard Dye* ); *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984) (hereinafter *Peick* ); *Republic Industries, Inc. v. Teamsters Joint Council,* 718 F.2d 628 (4th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984) (hereinafter *Republic Industries* ): *But see Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 741 F.2d 451 (1st Cir.1984) (hereinafter *Keith Fulton* ) (holding unconstitutional the presumption of correctness accorded the trustees' calculations on grounds of due process). With these decisions in mind, we review Thompson's constitutional contentions.

### A. *Due Process and Impairment of Contract*

■ Thompson contends that the MPPAA violates due process by imposing on Thompson financial liabilities for withdrawal from the Plan that it neither contemplated nor agreed to in its collective bargaining agreement with the Teamsters. Central to Thompson's argument is its belief that the due process clause of the fifth amendment restricts Congress from impairing contractual obligations to the same extent that the contract clause restricts state governments. U.S. Const. art. I, § 10, cl. 1. The Supreme Court in *R.A. Gray,* however, expressly rejected this argument. *R.A. Gray,* 104 S.Ct. at 2720. The Court reaffirmed that, for purposes of due process analysis, economic legislation comes to the court "with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."[5] [citations omitted] *Id.* at 2717–18, *quoting Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Economic legislation does not automatically violate due process simply because it upsets settled monetary expectations. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 15–16, 96 S.Ct. at 2892–2893 (1976). To assess the rationality of the MPPAA, we first must examine the problems that Congress perceived with ERISA in its original form.

By the 1970's many of the industries in which multi-employer plans were most common were in economic decline, and the changing demographics of the work force resulted in a larger proportion of retired to active employees, threatening the plans' contribution bases. *See* Report of the Committee on Education and Labor, H.R. Rep. No. 96–869, Part I, 96th Cong., 2d

---

**5.** The Seventh Circuit in *Nachman Corp. v. PBGC,* 592 F.2d 947 (7th Cir.1979), *affirmed on other grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), analyzed four factors in determining whether ERISA violated due process: (1) the reliance interests of the parties affected; (2) whether impairment of the private interest occurred in an area previously subjected to government regulation; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. *Nachman Corp.,* 592 F.2d at 960. In *Shelter* *Framing* we utilized the *Nachman* analysis to review the MPPAA's retroactive provisions. *Shelter Framing,* 705 F.2d 1510–15. The Supreme Court in *R.A. Gray,* 104 S.Ct. at 2712 n. 6, however, took note of the *Nachman* methodology, but rejected it as an appropriate vehicle for due process analysis, except as the *Nachman* factors might bear on whether legislation is rational. We have examined the MPPAA in light of *Nachman,* and we are confident that our decision would be unaffected if we were to employ the *Nachman* factors.

Sess. 54, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2922 (hereinafter House Report Part I).

ERISA, however, severely restricted funding alternatives for financially distressed plans, leaving the plans with little choice but to demand increased contributions. *Id.* *See also* Report of the Committee on Ways and Means, H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 3001 (hereinafter House Report Part II). Unfortunately, ERISA also limited employers' termination liability to a maximum of thirty percent of the employer's net worth. 29 U.S.C. §§ 1362(b)(2); 1364(b). As a result, employers faced with escalating contributions sometimes found termination liability less expensive than continuing the plan. House Report Part I at 54, 61, 1980 U.S.Code Cong. & Ad.News at 2922, 2929.

Further, coverage of the plans under ERISA initially was at the discretion of the PBGC, 29 U.S.C. § 1381(c)(2) (1976), and if the plan did not terminate within five years after the employer withdrew, the employer escaped all liability for the plan's shortfall, 29 U.S.C. § 1364 (1976). Consequently, employers contemplating withdrawal from financially shaky plans were encouraged to act as early as possible, and gamble either that the PBGC would elect not to cover the plan, or that the plan would survive for five more years. *See Standard Dye,* 725 F.2d at 849; House Report Part I at 60, 1980 U.S.Code Cong. & Ad.News at 2928. Employers remaining in the plan, on the other hand, had an incentive to terminate it immediately to avoid inheriting the withdrawing employer's share of the liability.

Because of these effects, the House Committee on Education and Labor found that ERISA in its original form "threaten[ed] the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and termination of plans in financial distress." House Report Part I at 55, 1980 U.S.Code Cong. & Ad.News at 2923. *See also* Report of the Committee on Ways and Means, House Report Part II at 10, 1980 U.S.Code Cong. & Ad.News at

3001. To address these problems, the MPPAA imposed upon withdrawing employers an obligation to fund their proportionate share of the plan's unfunded benefit obligations. 29 U.S.C. § 1381. *See* House Report Part I at 67, 1980 U.S.Code Cong. & Ad.News at 2935; House Report Part II at 15, 1980 U.S.Code Cong. & Ad. News at 3004.

■ We do not consider the MPPAA's statutory withdrawal liability an irrational solution to the funding crisis faced by the multiemployer pension plans. A fund's actuarial soundness at any specific time depends on a complex interaction of many factors including anticipated life spans of beneficiaries, estimated appreciation or depreciation of fund assets, and the likelihood that the contribution base will remain stable. The conservatism with which estimates of these factors are made may affect the outcome, and the numbers that are attached to these concepts are at best "still picture[s] of a moving target." *Peick,* 724 F.2d at 1267. Even though the process is dynamic, Congress' decision that the calculations be made upon the employer's withdrawal is reasonable. By forcing the economic burden upon the employer at the time of withdrawal, the Act insures that the employer will give appropriate consideration to the fund's soundness as part of the withdrawal decision. *Id.* *See also The Washington Star,* 729 F.2d at 1510.

■ Further, employers contemplating withdrawal have little incentive under the MPPAA to gamble that they will escape liability, and employers remaining in the fund no longer need to terminate the plan precipitously to avoid assuming liability for the fund's entire shortfall. Although the MPPAA may not be a perfect solution, in that it assesses liability for withdrawals where pension funds are not in danger of immediate insolvency, Congress has great flexibility to devise solutions to economic problems, *see Turner Elkhorn Mining,* 428 U.S. at 19, 96 S.Ct. at 2894; *The Washington Star,* 729 F.2d at 1510, and the wisdom or utility of legislation is for legislatures, not courts, to decide. *Ferguson v.*

*Skrupa,* 372 U.S. 726, 730–31, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963). As we have noted, determination of whether a plan is financially sound is a difficult calculation at best, and Congress had no obligation to deny relief to the funds until they unambiguously approached insolvency.

■ Thompson nevertheless argues that it is unfair to deprive it retrospectively of the benefit of its settled bargain with the Teamsters. *R.A. Gray,* however, makes clear that even retroactive aspects of economic legislation satisfy due process if justified by a rational legislative purpose. *R.A. Gray,* 104 S.Ct. at 2718. We believe it was neither irrational nor inequitable for Congress to require Thompson to fund the pensions it offered its employees. Thompson obtained economic benefits from participation in the Plan. The pension may have attracted some experienced employees with previous contributions to the Plan to work for Thompson, rather than for other non-participating employers, and encouraged yet other employees to remain working until their pension rights vested. Thompson profited from immediate access to a larger, skilled labor market and reduced labor turnover costs. In return, the employees expected to receive a pension. At the time of its withdrawal, Thompson had fully received its benefits from offering the pension, but its employees had not received full payment for their services. *See Standard Dye,* 725 F.2d at 857; *Nachman Corp.,* 592 F.2d at 962.

■ We find, as have other circuits that have addressed the issue, that Congress did not violate due process by imposing funding liabilities on employers who, after enactment of the MPPAA, withdrew from plans inadequately funded to meet their pension benefit obligations. *See Keith Fulton,* 741 F.2d 456–58 (withdrawal liability neither arbitrary nor irrational); *The Washington Star,* 729 F.2d at 1510 (not irrational for Congress to impose liability on employers who profited from employees' services in exchange for offer of pension plan); *Standard Dye,* 725 F.2d at 852–53 (same); *Peick,* 724 F.2d at 1273 (not inequitable to impose liability on employers when pension plans are underfunded). *Ac-*

*cord Republic Industries,* 718 F.2d at 639 (not inequitable to impose liability on employers who benefited from employees' services).

### B. *Procedural Objections*

In *R.A. Gray* the Supreme Court did not address the constitutional arguments that Thompson levels against the Act's procedural provisions, 104 S.Ct. at 2717 n. 7, and our decision in *Shelter Framing* rested only on grounds of due process, 705 F.2d 1515. We therefore address Thompson's procedural contentions as a matter of first impression in this circuit.

#### 1. *Denial of an Impartial Tribunal*

■ Thompson contends that the MPPAA deprives Thompson of an impartial tribunal by giving the Fund's trustees initial responsibility to determine the withdrawal liability. *See* 29 U.S.C. § 1399. The trustees, Thompson contends, have an inherent interest in assessing as large a liability as possible, and, despite this alleged conflict of interest, the trustees' determination rebuttably is presumed correct. 29 U.S.C. § 1401(a)(3).

Most of the appellate courts that have addressed this argument have found no institutional bias on the part of the trustees. *See The Washington Star,* 729 F.2d at 1511; *Standard Dye,* 725 F.2d at 855; *Republic Industries,* 718 F.2d at 640–41. *But see Keith Fulton,* 741 F.2d at 460–62. Many of the trustees' functions are ministerial, not adjudicative in nature, thus diminishing the opportunities to inject bias. *Republic Industries,* 718 F.2d at 640 n. 13. Moreover, they bring to this task a specialized knowledge of the Plan not available elsewhere, and are under a fiduciary duty to act neutrally and reasonably in assessing withdrawal liability. *The Washington Star,* 729 F.2d at 1511.

■ We respectfully decline to follow the First Circuit's holding in *Keith Fulton* that the trustees are compelled by their fiduciary duty to the Fund to assess the highest possible liability, or that they may be motivated by intentions to punish the

withdrawing employer or deter others from withdrawing. The method of computing liability is carefully prescribed by the Act. To the extent that the presumption allows the trustees to select from a range of possible liabilities, the presumption is rational. Congress reasonably might have allowed the trustees a narrow range of flexibility to determine withdrawal liability conservatively. We agree with the reasoning of the Fourth Circuit in *Republic Industries* rejecting a similar challenge, 718 F.2d at 640–41 and find no denial of an impartial tribunal.

### 2. *Lack of Preseizure Hearing*

■ Thompson next argues that the Act unconstitutionally deprives Thompson of its property without a preseizure hearing, *see Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), by requiring payment of disputed amounts during the pendency of a review or appeal challenging the accuracy of the Fund's calculations. *See* 29 U.S.C. § 1399(c)(2). Due process requires an opportunity to be heard in a meaningful time and manner, *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), and some form of hearing certainly is required before an individual finally is deprived of a property interest, *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

■ We note, however, that on the record before us Thompson has not been deprived of any property. Thompson had statutory rights to point out inaccuracies in the trustees' calculations, request reconsideration by the trustees, 29 U.S.C. § 1399(b)(2), initiate arbitration, 29 U.S.C. § 1401(a)(1), and seek review by the courts, 29 U.S.C. § 1401(b)(2). Even after the amounts became "due and owing," 29 U.S.C. § 1401(b)(1), the trustees merely commenced these proceedings for collection. Consequently, *Fuentes v. Shevin*, involving seizure of property by government agents prior to a hearing, is inapposite. Thompson has been afforded all the process to which it was due. *Accord Keith Fulton*, 741 F.2d at 462–63; *Standard Dye*, 725 F.2d at 854; *Republic Industries*, 718 F.2d at 642.

### 3. *Mandatory Arbitration*

Thompson challenges the MPPAA's mandatory arbitration provisions on constitutional grounds. At the outset we note that Thompson failed to take the steps required by the Act to obtain arbitration. In *Shelter Framing*, however, we held that an employer may mount such a facial constitutional challenge to the Act's provisions without first submitting to arbitration. 705 F.2d at 1509. Consequently, we will consider the constitutional arguments.

■ Thompson contends the MPPAA's mandatory arbitration provisions deny it the right to trial by jury. The seventh amendment, however, grants a right to trial by jury only in actions known to the common law. The Fund's cause of action under the MPPAA never existed under common law. Congress may delegate fact-finding functions to non-jury bodies in cases involving newly created statutory rights. *See, e.g., Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 458–61, 97 S.Ct. 1261, 1270–72, 51 L.Ed.2d 464 (1977); *The Washington Star*, 729 F.2d at 1511; *Standard Dye*, 725 F.2d at 855.

■ Nor are we persuaded that the MPPAA's · mandatory arbitration procedures, 29 U.S.C. § 1401(a), and the statutory presumption of correctness accorded to the arbitrators' factual findings, 29 U.S.C. § 1401(c), unconstitutionally vest judicial functions in persons who lack the tenure and salary protections of article III. *See* U.S. Const. art. III, § 1. To make this argument, Thompson relies primarily on *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which the Supreme Court invalidated a portion of the Bankruptcy Reform Act of 1978 on grounds similar to those Thompson urges here.

It is uncontested that the arbitrators are not judges for article III purposes. In

*Northern Pipeline*, a plurality of the Court recognized only three narrow situations in which persons unprotected by article III could discharge judicial functions: (1) territorial courts, (2) courts-martial, and (3) "legislative courts" created to adjudicate "public rights." *Id.* at 64–67, 102 S.Ct. at 2867–69. Only the third exception is arguably applicable here.

Even if the arbitrators cannot be considered "legislative courts" exempt from the commands of article III, however, they still can function as factfinding "adjuncts" of the district court, provided that the court itself retains and exercises the essential attributes of federal judicial power. *Northern Pipeline*, 458 U.S. at 77, 102 S.Ct. at 2874. *See, e.g., Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Commission*, 430 U.S. at 450 n. 7, 97 S.Ct. at 1266 n. 7; *Crowell v. Benson*, 285 U.S. 22, 51–65, 52 S.Ct. 285, 292–298, 76 L.Ed. 598 (1932). As *Northern Pipeline* noted, however, the "essential attributes of judicial power", *Northern Pipeline*, 458 U.S. at 81, 102 S.Ct. at 2876, may differ depending on the type of rights at issue. *Id.* at 83, 102 S.Ct. at 2877. Congress possesses great discretion to delegate limited factfinding functions to specialized non-article III bodies and to create presumptions limiting judicial review where Congress itself has created the substantive federal right to be adjudicated. *Id.* By contrast, where rights arise from the Constitution or state law, Congress' power to encroach upon traditional judicial functions is much more limited. *Id.* at 84, 102 S.Ct. at 2878. In such cases, the court must retain power to review more closely the actions of the non-article III body.

In *Crowell*, for example, Congress created a system of compensation for injured federal employees and delegated to an administrative agency the responsibility to make limited factual findings regarding the employees' injuries. The agency's factual findings were considered final if supported by evidence, but the statute left the courts free to review de novo all questions of law.

The Supreme Court held that "the reservation of full authority to the court to deal with matters of law provides for the appropriate exercise of the judicial function ...." [6] *Crowell*, 285 U.S. at 54, 52 S.Ct. at 293.

On the other hand, in *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the 1978 Federal Magistrates Act allowed non-article III magistrates to make findings and recommendations on a wide variety of pretrial motions, including those based on alleged violations of constitutional rights. The Court upheld this broad delegation of judicial power only because the Act allowed de novo review by the court of both the factual and legal conclusions of the magistrate, *id.* at 681–83, 100 S.Ct. at 2415–16, and the court controlled what issues were referred to the magistrate and could remove the magistrate from office. *Id.* at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring). *Accord Northern Pipeline*, 458 U.S. at 85, 102 S.Ct. at 2878 (invalidating the Bankruptcy Act's similarly broad delegation because, inter alia, the bankruptcy court's judgment was reviewable only under a "clearly erroneous" standard); *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 545–46 (9th Cir.1984) (en banc) *cert. denied*, —— U.S. ——, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984) (upholding consensual referral of civil suits to magistrates on the partial grounds that article III courts retained full authority over questions of law, selected the magistrates and could cancel orders of reference sua sponte).

The instant statute is most similar to the law at issue in *Crowell*. As in *Crowell*, Congress has created a system of substantive federal rights and responsibilities and has delegated to arbitrators the power to make limited factual findings in an area within which they possess special expertise. Only these factual findings are presumed correct, 29 U.S.C. § 1401(c), and therefore the district court may review de novo all

---

**6.** *Northern Pipeline* interpreted the administrative agency in *Crowell* as serving the role of a factfinding adjunct of the district court. 458 U.S. at 78, 102 S.Ct. at 2875. We note, however, that the public rights doctrine also might have applied.

conclusions of law. We find that, in this limited area of congressionally created statutory rights, the Act's reservation to the court of the authority to decide de novo all issues of law and to review factual findings for a clear preponderance of the evidence "provide[s] for the appropriate exercise of the judicial function" by an article III tribunal. *See Northern Pipeline*, 458 U.S. at 81, 102 S.Ct. at 2876; *Crowell*, 285 U.S. at 54, 52 S.Ct. at 293. *Accord Republic Industries*, 718 F.2d at 640; *cf. Standard Dye*, 725 F.2d at 855 (no denial of meaningful access to courts because MPPAA provides for judicial review of arbitration award); *Peick*, 724 F.2d at 1277 (same).

### 4. *Taking Without Compensation*

■■■ Finally, Thompson contends the MPPAA effects a "taking without compensation" by depriving Thompson of its property rights in its contract. The fifth amendment's takings clause, however, does not prohibit Congress from readjusting the contractual relationships of private parties. In *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), for example, a bank argued that the Bankruptcy Reform Act's invalidation of the bank's liens on a debtor's property constituted an uncompensated taking. Although the Court avoided the constitutional question by construing the statute narrowly, its discussion of the takings clause indicated its adherence to a distinction between purely contractual rights and identifiable property rights:

> [O]ur cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral.

103 S.Ct. at 411. Relying on *Security Industrial Bank*, the Seventh Circuit in *Peick* held that employers' contractual disclaimers of pension fund liability were not protected by the takings clause. *Peick*, 724 F.2d at 1276. *Accord Keith Fulton*, 741 F.2d at 462–63; *Republic Industries*, 718 F.2d at 642–43. We agree that the Act does not effect an uncompensated taking of Thompson's property.

### II. Involuntary Withdrawal Because of Union Action

Thompson strongly argues that withdrawal liability is unfair because Thompson's withdrawal was involuntary, and was prompted by the union's unilateral disclaimer of representation. The record is silent on why the union withdrew, but Thompson does not allege that the withdrawal was improperly motivated. This court is not faced, therefore, with the question whether a union legitimately could withdraw as a deliberate tactic to impose withdrawal liability on an employer.

■■■ Thompson also claims that the assessment of withdrawal liability of $103,-156.52 constitutes a taking of property without compensation. Withdrawal liabilities under the MPPAA, however, cannot be deemed a "taking" because such "interference arises from [a] public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The employer's liability is assessed in rough proportion to the shortfall of the employer's contributions to the vested benefits of the employer's employees. This liability is not so onerous or unfair as to constitute an unconstitutional taking.

Thompson concedes that Congress considered whether to adopt special liability rules for involuntary employer withdrawals caused by union action, but deferred decision pending a special study by the PBGC. *See* MPPAA, Pub.L. No. 96–364, § 412(a)(1)(B), 94 Stat. 1208, 1309 (1980).[7]

---

7. Section 412 provides in relevant part:
   (a)(1) The Pension Benefit Guaranty Corporation shall conduct a separate study with respect to—

   .   .   .   .   .

   (B) the necessity of adopting special rules in cases of union-mandated withdrawal from multi-employer pension plans.
   (2) The Corporation shall report to the Congress the results of the studies conducted un-

This deferral indicates that Congress intended to allow withdrawal liability to attach in the interim. We therefore must consider whether Congress' inaction pending the study was rational.

At the outset we note that many, if not most, employer withdrawals are involuntary to some degree, but no appellate court has found that factor relevant. *See, e.g., Keith Fulton,* 741 F.2d at 458 (logical for Congress not to distinguish between withdrawals on the basis of voluntariness); *The Washington Star,* 729 F.2d at 1506 (employer ceased publication because of financial difficulties); *Standard Dye,* 725 F.2d at 846 (liquidation due to rising costs). Withdrawal liability attaches, not as a punishment for the employer's malice or willfulness in withdrawing from the plan, but to protect the vested pension interests of the employees. *See* 29 U.S.C. § 1001a(c)(3). In effect, the statute shifts to the employer the risks of business hazards that might cause withdrawal, presumably because the employer is in a better position to anticipate and insure against them. If employers escaped liability merely because their withdrawals were involuntary, a major protective feature of the MPPAA would be undercut.

Thompson suggests that union-forced withdrawals are qualitatively different. The union ought not to be allowed to bargain for a pension plan, then hold the sword of withdrawal liability over the employer's head. Congress, however, reasonably might have assumed union-forced withdrawals would be rare and should be treated no differently from other business risks. Further, as we noted above, Thompson itself has obtained benefits from offering the pension and must bear responsibility for meeting its employees' legitimate expectations. Even if Thompson escapes liability, the Fund's shortfall will not become the union's responsibility; it will be made up, if at all, by increasing contributions of other participating employers or by reducing benefits of the employees. Either alternative endangers the Fund, and defeats the policies of the Act.

der paragraph (1), including its recommendations with respect thereto.

The PBGC has not yet issued a report.

In light of the difficult questions surrounding the "union action" exception, Congress' decision to study the problem before legislating appears reasonable. We decline to read an exception into the statute.

## CONCLUSION

The district court's summary judgment for the Fund is AFFIRMED.