825 F.2d 415
 263 U.S.App.D.C. 278, 56 USLW 2093,
8 Employee Benefits Ca 2089
 I.A.M. NATIONAL PENSION FUND, PLAN A, A BENEFITS, et al.
v.
CLINTON ENGINES CORPORATION, Appellant (Two Cases).
I.A.M. NATIONAL PENSION FUND, BENEFIT PLAN A, et al., Appellants
v.
COOPER INDUSTRIES, INC.
 86-5304, 86-7015.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 31, 1987.
Decided July 28, 1987.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 85-02877).
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 84-03346).
 Jane Golden Belford, Washington, D.C., with whom Sheila McDonald Gill and F. Roberts Hanning, Jr. were on the brief for appellant in Nos. 86-5304 and 86-5387.
 Denis F. Gordon, Washington, D.C., with whom David M. Ermer and Robert T. Osgood were on the brief for appellants in No. 86-7015 and appellee in Nos. 86-5304 and 86-5387. Laura Steinberg, Boston, Mass., also entered an appearance for appellee in Nos. 86-5304 and 86-5387.
 Peter H. Gould, Washington, D.C., for amicus curiae, Pension Benefit Guar. Corp., urging a remand to the Dist. Court in No. 86-7015.
 Before EDWARDS and STARR, Circuit Judges, and SWYGERT,* Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 These two cases involve contests over employers' financial obligations to multiemployer pension funds. The cases arise under the Multiemployer Pension Plan Act Amendments of 1980 ("the MPPAA"), 29 U.S.C. Secs. 1381-1461 (1982 & Supp. III 1985). Both cases pose a single issue: whether an employer that has been assessed "withdrawal liability" within the meaning of the MPPAA must arbitrate its asserted defenses to liability in order to preserve those defenses for ultimate judicial consideration. On the basis of Congress' clearly expressed intent, we conclude that the employers in these cases were bound initially to resort to arbitration. Having failed to do so, the employers have thereby waived these defenses and cannot raise them in actions brought by the pension plan sponsor to collect amounts owed by virtue of withdrawal liability.
 
 
 2
 * Before examining the facts of these cases, we first pause to review the governing statutory framework.[1] In the MPPAA, Congress prescribed a mechanism obligating employers who withdraw from a multiemployer pension plan to contribute to the plan a reasonable share of unfunded, vested employee benefits. Congress crafted this intricate scheme in response to evidence that the preexisting pension plan termination insurance program, enacted as title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93-406, tit. IV, 88 Stat. 1020 (codified in various titles of U.S.C.), perversely operated to provide employers with an incentive to withdraw from financially weak plans. The tendency of employers to abandon financially fragile plans posed a threat, in turn, to the solvency of the Pension Benefit Guaranty Corporation, the ERISA-created entity charged with administering the program and insuring payment of vested benefits when a plan terminates with insufficient assets. See 29 U.S.C. Secs. 1301-1309 (1982 & Supp. III 1985); Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 729 F.2d 1502, 1504-05 (D.C.Cir.1984). The MPPAA was designed to shore up these weak points.
 
 
 3
 At the heart of the MPPAA's regime are provisions for informal, expeditious resolution of withdrawal liability disputes. See Washington Star, 729 F.2d at 1505. See generally 29 U.S.C. Secs. 1381-1399. Initially, upon an employer's withdrawal, the plan sponsor must promptly determine the amount of liability, formulate a payment schedule, and notify the employer of the resulting assessment and schedule. See 29 U.S.C. Secs. 1382, 1399(b)(1). Within 90 days of notification, the employer may request that the sponsor review its determination. Id. Sec. 1399(b)(2)(A). If either party is dissatisfied with the outcome of this review, Congress mandates arbitration. The operative statutory language is as follows:
 
 
 4
 Any dispute between an employer and the plan sponsor of a multiemployer pension plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.
 
 
 5
 Id. Sec. 1401(a)(1).[2] Thus, Congress' directive is clear. Any dispute over withdrawal liability as determined under the enumerated statutory provisions shall be arbitrated.[3] Judicial consideration of disputes is then contemplated in the context of an action by any of the parties to arbitration "to enforce, vacate, or modify the arbitrator's award." Id. Sec. 1401(b)(2); see also id. Sec. 1451.
 
 
 6
 Recently, this court had occasion to interpret the mandate of section 1401(a). In Grand Union Co. v. Food Employers Labor Relations Association, 808 F.2d 66 (D.C.Cir.1987), the court emphatically rejected an employer's effort to secure a judicial declaration of its rights and liabilities under the pertinent MPPAA provisions without first resorting to arbitration:
 
 
 7
 "Arbitrate first" is indeed a rule Congress stated unequivocally.... [I]nitial recourse to arbitration is a statutory direction, one generally to be followed unless neither party timely presses the plea in abatement, and the court finds that deferring a court contest while the parties repair to arbitration "will neither lead to the application of superior expertise nor promote judicial economy."
 
 
 8
 Id. at 70 (quoting I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Industries, 727 F.2d 1204, 1210 (D.C.Cir.1984)) (emphasis in original).
 
 
 9
 In adumbrating a "narrowly cabined" set of exceptions to the general rule "arbitrate first," id. at 68, Grand Union discussed our court's earlier decision in I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Industries, 727 F.2d 1204 (D.C.Cir.1984). In Stockton, we held, as have all other circuit courts that have considered the issue, that section 1401(a) of the MPPAA was not an "absolute jurisdictional bar," but instead constituted an "exhaustion of administrative remedies" requirement. See id. at 1207.[4] We concluded "under the particular circumstances" of that case, id. at 1205, that the employer's failure to arbitrate did not prevent it from raising its defenses in the context of a collection action. For one thing, the Stockton court reasoned, requiring arbitration would serve none of the policies underlying the exhaustion doctrine. Id. at 1210. Equally important, the employer in that case had sought arbitration but had been rebuffed by the plan sponsor. Indeed, the issue of arbitration arose only when the plan sponsor, having lost in the district court, raised it on appeal. Id. at 1206. As the court noted in Grand Union, in Stockton "[t]he situation was a classic one for the application of a waiver or preclusion analysis." Grand Union, 808 F.2d at 69. The Grand Union court emphasized that "Stockton was indeed an exceptional case," id., and that except for the narrow circumstances found in Stockton, "[w]hen private ordering solely between the parties is unavailing, Congress instructed arbitration," id. at 70.
 
 
 10
 From the unambiguous language by which Congress established the primacy of arbitration in withdrawal liability disputes and in light of our decisions interpreting those terms, it should be beyond cavil that the existence of an issue of statutory interpretation, standing alone, does not justify bypassing arbitration. See id. Likewise, we do not read Grand Union to limit the need for arbitration to cases the records of which "bristle[ ]" with factual issues. Id. at 70 n. 5. On the contrary, it teaches that the general rule laid down by Congress, which the courts are bound to honor, is arbitrate first.
 
 II
 
 11
 With this statutory command in mind, we turn to the facts of the two cases. Without rehearsing those facts at length, we are satisfied that neither case falls within Stockton's exception.
 
 
 12
 Nos. 86-5304, 86-5387. On March 22, 1985, the I.A.M. National Pension Fund Plan A, A Benefits ("the Fund") notified Clinton Engines Corporation of the Fund's determination that Clinton had "partially withdrawn" from the Fund and thereby incurred withdrawal liability.[5] The Fund based its assessment of liability upon a decline in Clinton's work force and a corresponding decline in Clinton's contributions to the Fund, events which took place in 1980. See Appellant's Record Excerpts ("A.R.E."), Nos. 86-5304, 86-5387, at 39. The Fund's notice set forth, in addition to the demand for payment, a schedule under which Clinton's first payment was due May 21, 1985. See id. at 40; see also 29 U.S.C. Sec. 1399(c)(2).
 
 
 13
 In a letter dated April 9, 1985, Clinton disputed the Fund's determination. A.R.E. Nos. 86-5304, 86-5387, at 41. Unmoved, the Fund, in response, reiterated its demand for payment. Id. at 42; see also 29 U.S.C. Sec. 1399(b)(2)(B). Clinton thereafter neither made payments nor sought arbitration, which it was entitled to do within 60 days after the Fund notified it of the Fund's continued demand for payment. See id. Sec. 1401(a)(1)(A) (quoted supra note 2).
 
 
 14
 On September 10, 1985, the Fund brought this action for collection under 29 U.S.C. Sec. 1401(b)(1).[6] The Fund claimed that by virtue of Clinton's failure to honor its payment schedule, the entire amount of its partial withdrawal liability, $288,871.00, was immediately due and owing.[7] Clinton resisted, contending that it had incurred no liability on account of the decline in its fund contributions, because the decline had occurred prior to September 26, 1980, the effective date of the MPPAA. See 29 U.S.C. Sec. 1381 Note (Supp. III 1985) (reproducing Deficit Reduction Act of 1984, Pub.L. No. 98-369, Sec. 558(a), (c), (d), 98 Stat. 979).
 
 
 15
 The District Court granted summary judgment in favor of the Fund. I.A.M. National Pension Fund Plan A, A Benefits v. Clinton Engines Corp., No. 85-2877 (D.D.C. Apr. 28, 1986) (memorandum), A.R.E. Nos. 86-5304, 86-5387, at 61. The court concluded that Clinton, having failed to initiate arbitration, was not entitled to dispute either the existence or the amount of its withdrawal liability. Id. at 5-7, A.R.E. at 65-67. In so holding, the court rejected Clinton's invocation of Stockton to support the argument that defenses to liability raising purely legal issues could be advanced for the first time in a collection action, with no need initially to resort to arbitration. For one thing, the court reasoned, Clinton's defenses required resolution of disputed facts, in contrast to the situation which obtained in Stockton. For another, in Stockton the district court had already adjudicated both factual and legal issues before the question arose (on appeal) whether to send the parties back at that late stage to arbitration. Thus, in the trial court's view, arbitration in Stockton would not have spared expenditure of judicial resources, whereas in the case before it judicial efforts could in fact be conserved by arbitration. Finally, and in the court's estimation, "most important":
 
 
 16
 [I]n Stockton the pension plan had demanded withdrawal liability payments and then refused to arbitrate. After the case went through the District Court and was on appeal, the pension plan reversed its position and sought compelled arbitration. The equities in Stockton were thus unusual in that the employer's failure to arbitrate was not its fault, but the fault of the pension plan.
 
 
 17
 Id. at 5, A.R.E. at 65. On the basis of these various distinctions, the District Court declined to address Clinton's defenses, concluding that Clinton had waived them.[8]
 
 
 18
 On appeal, Clinton's principal arguments are, first, that the District Court read Stockton too narrowly, and, second, that the trial court erred in discerning factual issues in dispute. According to Clinton, no factual dispute exists because the Fund does not take issue with the amount or timing of the decline in Clinton's contributions. The only controversy, Clinton contends, is a legal one: whether the fact that this decline occurred before the MPPAA's effective date precludes an assessment of liability. Decrying the District Court's interpretation of Stockton, Clinton reads that case broadly to permit an employer to refuse to make withdrawal liability payments, bypass arbitration, and wage its battle in a collection suit when the employer's defenses present a "pure" issue of statutory interpretation.
 
 
 19
 No. 86-7015. This case concerns the Fund's determination that Cooper Industries had incurred liability by "completely withdrawing" from the Fund within the meaning of 29 U.S.C. Sec. 1383.[9] This liability, in the Fund's view, arose as a result of two actions which, taken together, amounted to Cooper's "permanently ceas[ing] all covered operations under the plan." See id. Sec. 1383(a)(2); see also Complaint at 2, I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, No. 84-3346 (filed Nov. 1, 1984), R.E. No. 86-7015, at 1, 2. The first event was Cooper's sale of its Airmotive Division in 1981, which ended its obligation to contribute on behalf of certain employees in that division. The second occurred in 1984, when Cooper ceased operation of its Crescent Tool Division and at the same time terminated contributions for employees in that division. On August 9, 1984, the Fund advised Cooper that it had incurred withdrawal liability by virtue of these two developments; in that notification, the Fund fixed September 25, 1984 as the date on which Cooper's first installment was due.
 
 
 20
 In response to this demand, Cooper requested that the Fund review its determination. See R.E. No. 86-7015, at 47; see also 29 U.S.C. Sec. 1399(b)(2)(A).[10] Cooper argued that in determining that a withdrawal had occurred, the Fund had erred by taking into account the sale of Cooper's Airmotive Division because that sale, Cooper claimed, complied with 29 U.S.C. Sec. 1384. The latter provision provides, in effect, a "safe harbor" protecting an employer from withdrawal liability with respect to a sale of assets that meets certain requirements, all of which are designed to shift the obligation for contributions to the purchaser while leaving the seller secondarily liable for a five-year period after the sale.[11] At the time Cooper sought a redetermination from the Fund, it announced its intention to seek judicial relief if the Fund did not reassess its liability determination to exclude the Airmotive sale.[12] Because this announcement, as we shall presently see, figures prominently in Cooper's argument on appeal, we err on the side of completeness and set it out in full:
 
 
 21
 [W]e hope that, upon the [Fund's] reconsideration of this matter, they will agree with our assessment that the sale of Cooper Airmotive assets to Aviall does, in fact, still comply with the requirement of Section 4204 of ERISA [29 U.S.C. Sec. 1384]. However, if the Trustees [of the Fund] are not prepared to join us in that conclusion, Cooper and Aviall are ready and willing to join the Trustees in an action seeking a declaratory judgment concerning the proper interpretation of the "substantially the same" [see supra notes 11-12] requirement of Section 4204 in order to avoid the necessity of our seeking injunctive relief against the collection of the liability. (As you know, because there is no disagreement over the facts in this dispute, arbitration is not mandated under Section 4221 of ERISA [29 U.S.C. Sec. 1401]. In cases such as this one, where the only dispute between the employers and the multiemployer pension fund is a question of the proper interpretation of a section of MPPAA, the courts have routinely held that arbitration is futile and unnecessary. See, e.g., I.A.M. National Pension Fund v. Stockton TRI Industries, [727 F.2d 1204 (D.C.Cir.1984) ], and T.I.M.E.-D.C., Inc. v. Trucking Employees of North Jersey Welfare Fund, [560 F.Supp. 294 (E.D.N.Y.1983) ]. Therefore, we believe that our dispute over the requirements of Section 4204 will be ripe for litigation upon our receipt of an adverse determination under Section 4219(b)(2). [29 U.S.C. Sec. 1399(b)(2), supra note 10].
 
 
 22
 Letter from Carl Taylor, Counsel for Cooper, to Alan Skolnick, Fund Director, at 6 (Aug. 31, 1984), R.E. No. 86-7015, at 52.
 
 
 23
 Having received no payments from Cooper, the Fund filed this collection action on November 1, 1984. See 29 U.S.C. Sec. 1401(b)(1). Four days later, the Fund notified Cooper that the Fund stood by its earlier determination, thereby rejecting Cooper's arguments with respect to the sale of the Airmotive Division. See 29 U.S.C. Sec. 1399(b)(2)(B). This notification triggered the sixty-day period during which either Cooper or the Fund could initiate arbitration under the MPPAA. See id. Sec. 1401(a)(1). Cooper chose, however, not to avail itself of this arbitral opportunity. Instead, it responded to the Fund's collection action by filing a counterclaim seeking a declaration of its rights and an injunction against the Fund's collection efforts. The Fund, in turn, resisted this attempt to expand the litigation, maintaining that under section 1401(b)(1) Cooper could not raise its statutory arguments in a collection action, having declined to do so in arbitration.
 
 
 24
 On the parties' motions for summary judgment, the District Court concluded that arbitration was unnecessary because Cooper's defenses and counterclaim posed only issues of statutory interpretation. See I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc., No. 84-3346 (D.D.C. June 28, 1985) (Memorandum Order), R.E. No. 86-7015, at 72. The court interpreted our decision in Stockton as permitting initial resort to the judiciary in such instances. Id. at 4, R.E. at 75. Reaching the merits of the employer's defenses and counterclaim, the court ruled in Cooper's favor. I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc., 635 F.Supp. 335 (D.D.C.1986), R.E. 86-7015, at 89. Specifically, the trial court held that in assessing liability the Fund should not have taken into account Cooper's sale of its Airmotive Division, inasmuch as that transaction satisfied the requirements of the sale-of-assets exemption, 29 U.S.C. Sec. 1384. Id. at 338-40, R.E. No. 86-7015, at 94-100.[13]
 
 
 25
 * * *
 
 
 26
 We are persuaded that the mandate of section 1401, as authoritatively construed in Grand Union, requires the employers in both cases to have resorted initially to arbitration in order to interpose defenses to assessments of withdrawal liability. The exception to the arbitrability requirement articulated by Stockton, we are constrained to conclude, obtains in neither case. From the outset of both proceedings, the Fund pressed its insistence that defenses, if any, be raised initially in arbitration. In no manner did the Fund waive its right to insist that employers honor Congress' "statutory direction." Grand Union, 808 F.2d at 70.[14] Unless neither party raises in timely fashion the arbitration requirement in abatement, Grand Union makes clear, arbitration is not excused.
 
 
 27
 In addition, establishing that disputes raise only questions of statutory interpretation will not, standing alone, suffice to remove a case from the arbitrability requirement. As recognized in Grand Union, carving out such an exception would sap judicial resources by requiring case-by-case determinations of arbitration's utility. See id.; see also Combs v. Bowling & Hildebrand Trucking Co., No. 84-1451, slip op. at 10 (D.D.C. Feb. 21, 1985) ("Judicial economy is best served by encouraging compliance with the statute's dispute resolution provisions, not by rewarding a party's refusal to even attempt to meet those requirements."). Such an approach, moreover, would yield few countervailing benefits. After all, only in unusual cases are there apt to be no disputed facts. The expenditure of judicial resources necessary to identify this handful of cases would likely outweigh whatever efficiencies might be gained by pretermitting arbitration in these cases.
 
 
 28
 More fundamentally, an exception for cases raising questions of statutory interpretation would "drastically diminish the prime role Congress so plainly assigned to arbitration in the MPPAA dispute resolution scheme." Grand Union, 808 F.2d at 70. The unequivocal import of section 1401 is that all cases--even those involving no disputed facts--should proceed initially to arbitration. Congress presumably determined that a substantial portion of disputes could be promptly and efficiently resolved through informal procedures. See infra section III-B. And even as to those disputes which could not be finally resolved outside the judicial system, a broad arbitration requirement--coupled with statutorily mandated deference to the arbitrator's factual findings, 29 U.S.C. Sec. 1401(c),--would encourage the orderly development of the law in a forum other than the generalist judiciary, ultimately providing reviewing courts with better framed legal arguments. See Stockton, 727 F.2d at 1207-08 & nn. 7-8.
 
 
 29
 In short, arbitration reigns supreme under the MPPAA. And the consequences of failing to arbitrate pursuant to section 1401(a)(1), 29 U.S.C. Sec. 1401(a)(1), "[a]ny dispute concerning a determination made under sections 1381 through 1399" are clearly enunciated by the statute. Section 1401(b) provides in pertinent part:
 
 
 30
 If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor ... shall be due and owing on the schedule set forth by the plan sponsor.
 
 
 31
 Id. Sec. 1401(b)(1). Neither Cooper nor Clinton disputes that their defenses concern "determination[s] made under sections 1381 through 1399."[15]
 
 III
 
 32
 Thus it is that Clinton and Cooper seek to avoid the result of section 1401(b)(1), which clearly bars defenses to resist paying "the amounts demanded." The employers argue that at the time their respective disputes arose their defenses fell outside the scope of section 1401(a) as interpreted in Stockton because those defenses concerned solely issues of statutory interpretation. It is their position that Grand Union, which was decided while these cases were pending on appeal, overruled Stockton by restricting the circumstances in which resort to arbitration was excused to exclude situations like theirs.[16] To preclude them now from interposing their defenses, Clinton and Cooper maintain, would amount to an impermissibly retrospective application of Grand Union.[17]
 
 
 33
 To assess this argument, we begin with the general rule that judicial precedents apply not only prospectively but to all cases pending at the time they are decided. See National Association of Broadcasters v. FCC, 554 F.2d 1118, 1130 (D.C.Cir.1976); see also Mullins v. Andrus, 664 F.2d 297, 302-03 (D.C.Cir.1980). Rules, however, almost invariably carry with them certain exceptions. And so it is that in a narrow set of circumstances, retrospective application may be withheld when applying a new precedent to past conduct or prior events would work a "manifest injustice." Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). In the civil context, the principles governing whether to withhold retrospective application of judicial precedents were set forth in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Because of the pivotal importance of that case, we set forth in the text that follows the pertinent language of Chevron:
 
 
 34
 First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."
 
 
 35
 Id. at 106-07, 92 S.Ct. at 355 (citations omitted). See also Griffith v. Kentucky, --- U.S. ----, 107 S.Ct. 708, 713 n. 8, 93 L.Ed.2d 649 (1987) (reaffirming that "the area of civil retroactivity ... continues to be governed by the standard announced in Chevron Oil Co. v. Huson ").
 
 
 36
 * The first Chevron v. Huson factor weighs heavily in favor of holding Cooper and Clinton to the interpretation of section 1401(a) articulated in Grand Union. Even granting the employers the benefit of the doubt, we are persuaded that Grand Union does not satisfy the requirement that "the decision to be applied retroactively must establish a new principle of law ... by overruling clear past precedent." Chevron v. Huson, 404 U.S. at 106, 92 S.Ct. at 355. Three considerations compel this conclusion.
 
 
 37
 First, Grand Union did not overrule Stockton. To the contrary, it "clarified that Stockton is a case in which the party so tardily pleading arbitration had effectively waived the right to do so, and in which other factors did not impel the court to delay adjudication." 808 F.2d at 70. In adopting this interpretation of Stockton, the Grand Union court rejected the broad reading urged by the employer as flatly inconsistent with the statutory directive to arbitrate first, which "Congress stated unequivocally." Id. Thus, as Grand Union made clear, in allowing the statutory period for initiating arbitration to expire, Clinton and Cooper were flying in the teeth of statutory language clearly indicating that the result of this inaction could very well be maturation of the amount claimed by the Fund into a presently owing debt. See 29 U.S.C. Sec. 1401(a), (b)(1). The situation before us thus differs markedly from that presented in Chevron, in which the party seeking nonretroactivity could not reasonably have been expected to have any inkling of the law to be applied retrospectively. Chevron v. Huson, 404 U.S. at 107, 92 S.Ct. at 355; cf. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 495-504, 88 S.Ct. 2224, 2232-37, 20 L.Ed.2d 1231 (1968). In looking to Stockton for authority to bypass arbitration without waiving their defenses, Cooper and Clinton can fairly be held to the knowledge that Stockton represented a narrow, judicially articulated exception to a broad statutory requirement.
 
 
 38
 Second, important factual distinctions between Stockton's situation and that of Cooper and Clinton respectively should have triggered doubts in the employers' minds as to whether the Stockton exception would be availing. Most significantly, the employer in Stockton did not simply bypass arbitration, as Cooper and Clinton chose to do. To the contrary, the employer in that case, as we previously observed, attempted to initiate arbitration, but its efforts were rebuffed by the plan sponsor. Id. at 1206. What is more, the plan sponsor in Stockton made no attempt in the district court to prevent the employer from litigating its defenses in the collection action, as has the Fund in the case before us. The plan sponsor in Stockton could thus be said to have waived its right to interpose the arbitration bar by having waited to assert the bar until after suffering defeat on the merits in district court.[18] This was the height of cheek; it was at a minimum an unusual situation. Finally, Stockton expressly took note of the presence of a facial constitutional challenge mounted by the employer and found significant the fact that "[o]ther circuits have uniformly not required exhaustion for facial constitutional attacks." 727 F.2d at 1210 & n. 18 (citing cases).
 
 
 39
 Now to be sure, an uncritically broad reading of Stockton may well have led Clinton and Cooper to believe that their defenses were not subject to the arbitration requirement of section 1401. But, after reflecting on this matter at length, we are satisfied that the employers' obvious inability to fit themselves within the "specific circumstances ... of [that] case," 727 F.2d at 1207, precluded reasonably relying on that decision to risk completely losing the right to interpose their defenses. But there is more, for Stockton was not the only case in the MPPAA universe, as we shall now see.
 
 
 40
 And that brings us to the third point. An examination of decisions extant when Cooper and Clinton could have initiated arbitration should have generated uncertainty within corporate corridors about the breadth of the arbitration requirement and, correspondingly, the scope of exceptions to that requirement. Several district courts prior to Stockton had flatly rejected employers' attempts to litigate statutory interpretation defenses in court rather than through arbitration. See, e.g., Trustees of Western Teamsters Pension Fund v. Arizona-Pacific Tank Lines, 4 Employee Benefits Cas. (BNA) 2355, 2356 (N.D.Cal.1983); Speckmann v. Paddock Chrysler Plymouth, Inc., 565 F.Supp. 469, 473 n. 2 (E.D.Mo.1983); Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Ceazan, 559 F.Supp. 1210, 1218 (N.D.Cal.1983); Terson Co., Inc. v. PBGC, 565 F.Supp. 203, 206 (N.D.Ill.1982). But even if Stockton were thought implicitly to have rejected this line of cases, another obstacle was looming in the path of unbridled optimism about that decision's effect on the statutory scheme. For, tellingly, during the period when Cooper could have initiated arbitration, two post-Stockton district court decisions in the District of Columbia expressly and unequivocally rejected the very proposition that Cooper and Clinton claim Stockton espouses. See Combs v. Pelbro Fuel, Inc., No. 83-1524, slip op. at 9-16 (D.D.C. Nov. 15, 1984) Combs v. Adkins & Adkins Coal Co., Inc., 597 F.Supp. 122, 126-27 (D.D.C.1984); see also supra note 17. By the time Clinton was in a position to initiate arbitration, yet a third district court decision had issued rejecting the employers' optimistic position that arbitration could be skirted. Combs v. Bowling & Hildebrand Trucking Co., No. 84-1451 (D.D.C. Feb. 21, 1985); see also supra note 17. Indeed, Bowling specifically cited Stockton and expressly rejected a latitudinarian reading of that decision identical to that now championed by Cooper and Clinton. Id. at 7-10.
 
 
 41
 Although the employers struggle to impugn the reasoning of these district court cases or to distinguish them, we believe these efforts miss the point. To be sure, we have no doubt that these decisions, taken together, demonstrate that confusion and conflict existed over the arbitrability of defenses; indeed, the decisions well illustrate that rather fact-specific approach that many courts have adopted in resolving this issue. But that is but to say that Cooper and Clinton had ample notice of the dangers of reading Stockton without restraint, oblivious to the uncertainty that befogged this burgeoning area of the law.
 
 
 42
 In sum, we believe that a dispassionate survey shows that the statutory and decisional landscape of which Stockton was a part formed rather uneven terrain upon which Grand Union shed clarifying light. We are not, however, confronted with "clearly declared judicial doctrine ... which was overruled in favor of a new rule." Hanover Shoe, 392 U.S. at 496, 88 S.Ct. at 2233. Accordingly, we frankly harbor doubt whether our holdings in these cases even raise a serious issue of retroactivity. Both common sense and case law tend to suggest that the first Chevron v. Huson factor is a threshold requirement for purposes of retroactivity analysis.[19] But in any event, we find that when we turn to the other factors, they too weigh against the employers.
 
 B
 
 43
 Under the second Chevron v. Huson factor, Clinton and Cooper argue that holding them harmless for failing timely to initiate arbitration will not "retard the operation" of the MPPAA if we afford them a fresh opportunity on remand to resort to arbitration. Indeed, in their view this result would advance the purposes of the statute by asserting the primacy of arbitration as the initial forum for the resolution of MPPAA disputes.
 
 
 44
 It appears to us that the employers' conception of the purpose informing the MPPAA mistakes the ends that Congress had in mind with the means employed to attain them. From the language and structure of the statute, it appears that Congress designed the informal procedures to avoid the delay and expense in obtaining payment that pension plan sponsors would suffer were more formal proceedings required as a first step in resolving liability disputes. This intent to bring about expeditious resolution of such disputes is evident in the brief periods prescribed for plan sponsors to make determinations of withdrawal liability, notify employers of such determinations, and review those determinations. See 29 U.S.C. Sec. 1399(b) (providing that initial determination and notification take place "[a]s soon as practicable"); id. Sec. 1401(a)(1)(B) (regardless whether the plan has completed review of its determination, employer may initiate arbitration not later than 120 days after it requests review). The employer must likewise act promptly to request that the plan sponsor review its determination and to initiate arbitration. See id. Sec. 1399(b)(2)(A) (employer must seek review within 90 days); id. Sec. 1401 (a)(1) (similarly short deadlines for initiating arbitration).
 
 
 45
 Congress' intent to minimize delay in multiemployer pension plans' receiving payment is perhaps clearest in 29 U.S.C. Sec. 1399(c)(2), which requires employers to make interim payments pending arbitration. See also id. Sec. 1401(d) (interim payments "shall be made ... until the arbitrator issues a final decision"). This intent--also apparent in the legislative history[20]--has led courts to characterize the MPPAA as a "pay-first-question-later" statute. T.I.M.E.-D.C., Inc. v. Management-Labor Welfare & Pension Funds, 756 F.2d 939, 946-47 (2d Cir.1985); accord Robbins v. Pepsi-Cola Metropolitan Bottling Co., 800 F.2d 641, 642 (7th Cir.1986) (per curiam).
 
 
 46
 It should go without saying that the value of arbitration in fulfilling Congress' intent to provide an efficient, expeditious dispute resolution mechanism lies in initial resort to that mechanism. The National Legislature's intent would not, we believe, be furthered by requiring resort at this late stage. Indeed, permitting the employers now to do battle on the arbitration front would further prolong what have already become highly protracted proceedings. In short, we conclude that withholding retroactive application of Grand Union would promote the very evil that the MPPAA was designed to avoid.
 
 C
 
 47
 Under the third factor of Chevron v. Huson, Clinton and Cooper argue that it would be inequitable to deprive them of the opportunity to raise meritorious defenses to withdrawal liability. Cooper emphasizes that the District Court has already resolved the merits of its defenses in Cooper's favor, and that to hold it barred from raising that defense would reward the Fund with an undeserved victory. For its part, Clinton mounts a similar argument, directing our attention to a decision from the Sixth Circuit sustaining an employer's defense similar to that raised by Clinton. See Central States Pension Fund v. 888 Corp., 813 F.2d 760, 766-67 (6th Cir.1987).
 
 
 48
 We acknowledge that losing the opportunity to defend against the imposition of financial liability visits an obvious hardship upon these parties.[21] Cf. NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974) (retroactive application of agency ruling permitted though it would deprive employer of defense to unfair labor practice charges); Chevron v. Huson, 404 U.S. at 107-08, 92 S.Ct. at 355-56 (retroactive application would deprive respondent of his cause of action). The hardship seems all the more severe when the employer has prevailed in the trial court, as Cooper has. But, all things considered, we are unable to agree that bearing this hardship would work an inequity; the reason is that as to both Clinton and Cooper this unhappy result is in the main a "self-inflicted wound." Cf. IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 129 (3d Cir.1986). Neither Clinton nor Cooper was in reality forced to choose between, on the one hand, complying with the payment schedule and raising its defenses in arbitration, and, on the other hand, refusing to make payments and raising these defenses in a collection action brought by the plan sponsor.
 
 
 49
 Both employers appear to concede that they could have initiated arbitration in a timely fashion while, at the same time, maintaining their right to raise their defenses in a collection action and forcing precisely such an action by refusing to make payments.[22] It is true, to be sure, that this tack may have entailed the employers' litigating their defenses on two fronts--in both arbitration and court proceedings. On the other hand, it is at least possible that Cooper and Clinton could have obtained a stay of arbitration pending the court's ruling on whether their defenses were properly resolved in court or arbitration. It also appears that a second course was open to Cooper and Clinton. The employers could have elected conditionally to initiate arbitration while making interim payments and, in the meantime, seeking a declaratory judgment on the question whether these defenses had to be submitted to arbitration and, if not, whether they were meritorious. See 29 U.S.C. Sec. 1451(a)(1); cf. IUE, 788 F.2d at 128-29 (employer could have sought to enjoin imposition of liability before period to initiate arbitration expired); T.I.M.E.-D.C., Inc. v. New York State Teamsters Conference Pension & Retirement Fund, 580 F.Supp. 621 (N.D.N.Y.) (same), aff'd mem., 735 F.2d 60 (2d Cir.1984). By pursuing either course, Clinton and Cooper could have attempted to secure judicial resolution of their respective defenses while preserving the arbitration path if the court refused as an initial matter to resolve those defenses.[23]
 
 
 50
 Cooper's and Clinton's situations thus differ sharply from the typical case in which retroactivity is inappropriate, where the party arguing in favor of nonretroactivity could not reasonably be expected to have taken steps to avoid hardship. In Chevron v. Huson, for example, the Court refused retrospectively to apply its prior decision holding that a claim under the Outer Continental Shelf Lands Act was governed by state statutes of limitations rather than the federal doctrine of laches (as part of the law of admiralty). 404 U.S. at 100, 92 S.Ct. at 352. Because that holding had been announced in a case of first impression overruling a long line of precedent to the contrary, "[i]t [could] not be assumed that [respondent] did or could foresee that this consistent interpretation of the Lands Act would be overturned. The most he could do was to rely on the law as it then was." Id. at 107, 92 S.Ct. at 356.[24] Employing analogous reasoning, the Supreme Court in England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), refused retroactive application of its holding that a party loses the right to litigate constitutional claims in federal court if, after the federal court abstains pending resort to the state courts, the party then submits its constitutional claims to the state court for resolution. Id. at 419, 84 S.Ct. at 467. The Court concluded that at the time the party presented its constitutional claims to the state courts, a prior Court decision could reasonably have been read to require submission of constitutional claims to the state tribunal in order to preserve the right to litigate those claims subsequently in federal court. Id. at 414-15, 420-21, 84 S.Ct. at 464, 467.
 
 
 51
 In short, the employers here were not caught between the horns of a dilemma like the party in England, nor was the course they pursued the only reasonable one under the law as it existed at the relevant time, as was the case in Chevron v. Huson. Cf. Central States Pension Fund, 813 F.2d at 762-63 (statute providing defense to withdrawal liability was enacted after period for initiating arbitration expired, so employer could not have raised that defense in timely-initiated arbitration). Consideration of the third factor set out in Chevron v. Huson therefore provides no justification for nonretroactive application of Grand Union. Cf. Gray v. Office of Personnel Management, 771 F.2d 1504, 1512 n. 11 (D.C.Cir.1985) (finding no inequity in retrospective application where party arguing for nonretroactivity was partly responsible for period of delay during which new ruling issued), cert. denied, --- U.S. ----, 106 S.Ct. 1478, 89 L.Ed.2d 732 (1986).
 
 IV
 
 52
 To summarize, we hold that the defenses Cooper and Clinton sought to raise in the Fund's collection actions fall within the ambit of 29 U.S.C. Sec. 1401(a) as issues that should have been submitted to arbitration. Having failed to initiate arbitration, these employers were barred from raising their defenses in collection actions brought by the Fund. In light of this holding, we reverse the judgment in No. 86-7015 and remand with instructions to enter judgment in favor of appellant. We affirm the District Court's judgments in Nos. 86-5304 and 86-5387.[25]
 
 Judgment Accordingly
 
 
 *
 Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 We have previously described in some detail the intricacies of the MPPAA and will therefore limit our discussion to the provisions directly pertinent here. See Grand Union Co. v. Food Employers Labor Relations Ass'n, 808 F.2d 66, 68-69 (D.C.Cir.1987); Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 729 F.2d 1502, 1503-05 (D.C.Cir.1984); I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Indus., 727 F.2d 1204, 1206-09 (D.C.Cir.1984); see also Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720-25, 104 S.Ct. 2709, 2713-15, 81 L.Ed.2d 601 (1984); United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 138-42 (3d Cir.1986) (holding, inter alia, that presumption of correctness accorded to liability determinations by plan sponsors, 29 U.S.C. Sec. 1401(a)(3)(A), violates due process, in disagreement with Washington Star, 729 F.2d at 1511), aff'd by equally divided Court per curiam, --- U.S. ----, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987)
 
 
 [2]
 Section 1401(a)(1) goes on to set time limits within which parties may initiate arbitration:
 Either party may initiate the arbitration proceeding within a 60-day period after the earlier of--
 (A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or
 (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.
 29 U.S.C. Sec. 1401(a)(1).
 
 
 [3]
 That Congress intended initial resort to arbitration is further evidenced by section 1401(c), which requires reviewing courts to presume that arbitrators' findings of fact are correct unless rebutted by "a clear preponderance of the evidence." 29 U.S.C. Sec. 1401(c); see also Grand Union, 808 F.2d at 70
 
 
 [4]
 We reached this conclusion in part based on the teaching of Supreme Court decisions that distinguish jurisdictional exhaustion requirements from prudential ones, and that find the former "[o]nly when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision." See Stockton, 727 F.2d at 1208 (citing cases). At the same time, we recognized that the MPPAA arbitrative scheme differed from both a voluntary agreement between parties to arbitrate, on the one hand, and a typical administrative review process on the other. Id. at 1207-08 & nn. 7-8
 
 
 [5]
 See 29 U.S.C. Sec. 1385 (defining partial withdrawal as occurring when there is a 70% decline in contributions to a plan or a partial cessation of the employer's contribution obligation)
 
 
 [6]
 That section provides:
 If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.
 29 U.S.C. Sec. 1401(b)(1). See also id. Sec. 1451(c) (granting federal district courts concurrent jurisdiction with state courts of competent jurisdiction over actions by plan fiduciaries to collect withdrawal liability); Sec. 1132(e)(1), (granting federal district courts jurisdiction over, among other things, actions to collect delinquent contributions, see id. Sec. 1145). Subsection (a), as discussed supra note 2 and accompanying text, provides that the employer and plan sponsor must arbitrate if they are unable informally to resolve differences over withdrawal liability. Section 1399(b)(1), which is referred to in the quoted portion of section 1401, provides for notification to employers by plan sponsors of assessments of withdrawal liability and of payment schedules for the liability.
 
 
 [7]
 The Fund sought to recover three other sums in addition to the amount of Clinton's alleged withdrawal liability: its attorney's fees and costs, see 29 U.S.C. Secs. 1132(g)(2)(D), 1451(e); interest on the alleged liability, id. Sec. 1132(g)(2)(B); and an additional amount equal to the greater of (1) interest on the amount of withdrawal liability, calculated from the date that the Fund fixed for Clinton's first installment, or (2) liquidated damages as provided under the plan, see id. Sec. 1132(g)(2)(C)(ii). See Second Amended Complaint, at 4, A.R.E. Nos. 86-5304, 86-5387, at 8
 
 
 [8]
 Pursuant to 29 U.S.C. Sec. 1132(g)(2), see supra note 7, the court awarded the total amount of withdrawal liability claimed by the Fund, interest on that amount, an additional amount equal to the interest due, and reasonable attorney's fees. Clinton Engines Corp., No. 85-2877, slip op. at 7, A.R.E. Nos. 86-5304, 86-5387, at 67. In a subsequent memorandum and order, the court fixed the amount of attorney's fees after the parties failed to agree on this issue. I.A.M. National Pension Fund Plan A, A Benefits v. Clinton Engines Corp., No. 85-2877 (D.D.C. May 27, 1986), A.R.E. Nos. 86-5304, 86-5387, at 71. In No. 86-5304, Clinton appeals the initial court opinion and order of April 1986; in No. 86-5387, it appeals the subsequent ruling of May 1986 fixing attorney's fees. Since Clinton has not briefed its appeal in No. 86-5387, we treat their appeal of this ruling as premised on their argument that the ruling in favor of the Fund on the merits should be reversed
 
 
 [9]
 Section 1383 defines complete withdrawal as occurring when an employer permanently ceases to have an obligation to contribute under a plan or permanently ceases all covered operations under the plan. 29 U.S.C. Sec. 1383
 
 
 [10]
 After receiving notice that a plan sponsor has assessed withdrawal liability, an employer may within 90 days request review of the determination, point out inaccuracies, or furnish additional information. 29 U.S.C. Sec. 1399(b)(2)(A). The plan sponsor may then conduct a "reasonable review" of the employer's query. Id. Sec. 1399(b)(2)(B). If this review does not resolve the dispute, either party may initiate arbitration after the earlier of (1) the date on which the employer is notified of an assessment of liability, or (2) 120 days after the employer requests review under section 1399(b)(2)(A). Id. Sec. 1401(a)(1), quoted supra note 2
 
 
 [11]
 Under section 4204 of the MPPAA, 29 U.S.C. Sec. 1384, a sale of assets by an employer does not result in withdrawal liability as long as the sale meets certain conditions. Among other things, the transaction must meet the following requirements: (1) it must be a bona fide, arm's-length sale, id. Sec. 1384(a)(1); (2) the purchaser must have an obligation "for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan," 29 U.S.C. Sec. 1384(a)(1)(A); (3) the purchaser must provide a bond to secure its contribution obligation, id. Sec. 1384(a)(1)(B); and (4) the seller must remain secondarily liable for withdrawals that occur within 5 years after the sale, id. Sec. 1384(a)(1)(C)
 
 
 [12]
 The Fund took the position that Cooper's sale of the Airmotive Division failed to satisfy the "sale of assets" provision, 28 U.S.C. Sec. 1384, supra note 11, in two respects. First, Cooper's withdrawal was not contemporaneous with the sale; it occurred several years later. The Fund interpreted section 1384 to apply only to withdrawals that occurred as a result of (and thus contemporaneous with) the section 1384 sale. See Taylor Letter, R.E. No. 86-7015, at 48. Second, the Fund believed that Cooper's sale did not qualify for section 1384 treatment because Aviall, the purchaser, had not contributed "substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan," 29 U.S.C. Sec. 1384(a)(1)(A); see also supra note 11. To meet this requirement, in the Fund's opinion, a purchaser had to contribute at least 90% of the seller's base units in the twelve months immediately following the sale. It was undisputed that Aviall had contributed less than 90% during this period
 
 
 [13]
 The District Court rejected both arguments advanced by the Fund to support its position that section 1384 did not apply. See supra note 12. First, it held that "nothing in the statute ... support[s] plaintiffs' contention that Section 1384 is operative only where a contemporaneous complete or partial withdrawal occurs." Id. at 338, R.E. No. 86-7015, at 94. On the contrary, the court reasoned, the Fund's interpretation would permit a double recovery: from Aviall, which, pursuant to section 1384, assumed Cooper's contribution obligation, and from Cooper itself. Furthermore, in the District Court's view, Cooper's interpretation would discourage sellers from crafting sales to comply with section 1384 when the sale would not result in a complete or partial withdrawal, and thereby deprive employees affected by the sale of the protections afforded under that provision. Id. at 338-39, R.E. No. 86-7015, at 95
 The court also dismissed the Fund's contention that Aviall had not contributed "substantially the same" contribution base units as Cooper. See supra note 12. In the court's view, Aviall's contribution during the year after the sale of 79% of the contribution base units for which Cooper had been obligated in the year before the sale satisfied the "substantially the same" standard contained in the statute. Id. at 339-40, R.E. No. 86-7015, at 98-100.
 
 
 [14]
 See Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 5-6, 8, Clinton Engines (Mar. 10, 1986); Amended Memorandum in Support of Plaintiff's Motion for a Protective Order at 5-10, Cooper Industries (Dec. 11, 1984), R.E. No. 86-7015, at 29-34
 
 
 [15]
 As discussed supra text at 7-9; see also supra notes 12-13, Cooper's dispute concerned whether a sale of one of its divisions qualified for the exemption contained in 29 U.S.C. Sec. 1384 and therefore could not provide the basis for a determination of withdrawal liability. See Cooper's Brief at 3, 7. Clinton's dispute with the Fund involved whether "29 U.S.C. Sec. 1385(a) imposes partial withdrawal liability upon an employer for a decrease in contributions occurring before the effective date of the [MPPAA]." Clinton's Brief at 1 (emphasis in original); see also id. at 31-33 (discussing 29 U.S.C. Sec. 1397(a))
 
 
 [16]
 Neither Clinton nor Cooper contend that they satisfy the conditions set forth in Grand Union for bypassing arbitration. Specifically, in both cases the Fund has "timely pressed the plea [of the arbitration requirement of 29 U.S.C. Sec. 1401] in abatement." Grand Union, 808 F.2d at 70
 
 
 [17]
 Our decision in Stockton issued on February 14, 1984. The opinion in Grand Union was decided on January 13, 1987. It is clear that the latter decision appeared well after the period during which either Cooper or Clinton could have initiated arbitration. Under 29 U.S.C. Sec. 1401(a)(1)(A), Cooper was entitled to initiate arbitration within 60 days after November 5, 1984, when the Fund notified it that the Fund had reviewed its prior determination of withdrawal liability and stood by it. See Letter from A. Skolnick, Fund Director, to C. Taylor, Counsel for Cooper (Nov. 5, 1984), R.E. No. 86-7015, at 54. Clinton, it appears, could have initiated arbitration of its dispute during the sixty-day period following April 18, 1985, when in a letter the Fund reiterated its earlier determination that Clinton had incurred withdrawal liability. See A.R.E. Nos. 86-5304, 86-5387, at 42. Although Clinton initially disputed whether this letter triggered the statutory period for arbitration, it appears to have abandoned this argument, which the District Court rejected. See Clinton Engines, Memorandum Opinion at 3, A.R.E. Nos. 86-5304, 86-8387, at 63
 
 
 [18]
 Cooper contends that footnote 2 of Stockton, 727 F.2d at 1206 n. 2, forecloses reading that case as based on waiver. Cooper's Supplemental Brief at 4-5. We cannot agree. Footnote 2 reads as follows:
 Section 1401(a)(1) [of 29 U.S.C.] specifies a period within which a request for arbitration must be made in order to be timely. We need not decide whether Stockton's request for arbitration was timely inasmuch as we hold infra that the district court was correct in reaching the issue of whether, on the specific and undisputed facts of this case, Stockton had "completely withdrawn" from the Fund before the retroactive liability date without first requiring the issue to be arbitrated.
 Stockton, 727 F.2d at 1206 n. 2. It seems to us that whether or not Stockton's request was timely, the Fund could be said to have waived objections to defective initiation of arbitration by: (1) rejecting the request for arbitration on grounds other than its timeliness, see id. at 1206; and (2) failing to raise in the district court Stockton's failure timely to seek arbitration as a bar to litigation of Stockton's defenses. In any event, we are not convinced that Cooper can establish that it was justified in relying entirely on a single footnote of an opinion in an unusual case in the face of statutory language counseling caution prior to bypassing arbitration.
 
 
 [19]
 In contrast to the second and third factors, the first Chevron v. Huson factor was stated as a threshold requirement. See supra text at 19. This was reinforced in a case decided only six months after Chevron v. Huson. In Milton v. Wainwright, 407 U.S. 371, 381 n. 2, 92 S.Ct. 2174, 2180 n. 2, 33 L.Ed.2d 1 (1972), Justice Stewart, the author of Chevron v. Huson, stated (albeit in a dissenting opinion) that "[a]n issue of the 'retroactivity' of a decision ... is not even presented unless the decision in question marks a sharp break in the web of the law." (The majority in Milton, it bears noting, did not reach the retroactivity issue.) Further support for the view that the factor of a "sharp break" in the law is necessary to nonretroactive application of judicial precedent appeared in United States v. Johnson, 457 U.S. 537, 550 n. 12, 102 S.Ct. 2579, 2587 n. 12, 73 L.Ed.2d 202 (1982), a criminal case:
 In the civil context ... the "clear break" principle has usually been stated as the threshold test for determining whether or not a decision should be applied nonretroactively. Once it has been determined that a decision has "establish[ed] a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed," the Court has gone on to examine the history, purpose, and effect of the new rule, as well as the inequity that would be imposed by its retroactive application.
 (Citations omitted). Although in the context of that case, this passage is clearly dicta, we note that the Court appeared to take precisely the approach suggested in that passage in Hanover Shoe, 392 U.S. 481, 88 S.Ct. at 2225; there, the Court declined to withhold retrospective application of a decision after it concluded that the decision was foreshadowed in preceding opinions. See id. at 495-504, 88 S.Ct. at 2232-37. Since we conclude that none of the Chevron v. Huson factors favors Clinton and Cooper, we need not finally resolve this issue, which appears to be as yet unresolved in this circuit. Cf. Kremer v. Chemical Constr. Corp., 623 F.2d 786, 789 (2d Cir.1980) (finding the clear break factor a threshold test), aff'd on other grounds, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). But cf. Gray, 771 F.2d at 1511 (noting in dicta that "[n]othing in Huson mandates that all three factors be satisfied in order to decide the issue in favor of retroactivity").
 
 
 [20]
 Among other things, the legislative history makes clear that in enacting the MPPAA, Congress was animated by dissatisfaction with procedures for collection then in place:
 Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.
 Senate Labor Committee, Summary and Analysis of S.1076 (April 1980), reprinted in BNA Pension Reporter, Supp. No. 310 (Sept. 29, 1980), at 91.
 
 
 [21]
 We find it unnecessary for purposes of our analysis to address the merits of the defenses
 
 
 [22]
 See Cooper's Supplemental Brief at 9; Clinton's Supplemental Brief at 12. Cooper deprecates the value of this course, however, pessimistically predicting that it would necessitate duplicative proceedings. See Cooper's Supplemental Brief at 9. Clinton complains in a similar vein that "[w]hether Clinton Engines could have preserved for judicial review the question whether it could raise [its] defenses in a collection action would be a moot point if the collection action proceeded first limited solely to the issue of whether Clinton Engines had failed to pay monies assessed the pension fund." Clinton's Supplemental Brief at 12 (emphasis omitted). As we note in the text, however, dual proceedings were by no means a certainty. But in any event, the premise underlying these arguments--that employers have a right to withhold liability payments pending a final judicial determination of the dispute--is mistaken. Both the language of the statute and case law interpreting it make clear that no such right exists. Section 1399(c)(2) provides as follows:
 Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.
 29 U.S.C. Sec. 1399(c)(2). This provision has been interpreted to authorize a right on the part of plan sponsors to collect withdrawal liability payments pending arbitration. See Yahn & McDonnell, Inc., 787 F.2d at 132-34.
 
 
 [23]
 We emphasize that it should now be crystal clear in light of Grand Union that attempts to bypass arbitration should uniformly fail except in the narrow circumstances specified in that case. We merely cite the courses described in the text to show that by taking a more cautious route than they did, Cooper and Clinton would not now be faced with the prospect of having no forum at all in which to raise their defenses. It is in this sense that their hardship is self-inflicted
 
 
 [24]
 By way of contrast, compare Landahl v. PPG Industries, Inc., 746 F.2d 1312 (7th Cir.1984). In that case, the court retroactively applied a Supreme Court decision which announced that actions under the Labor Management Relations Act of 1947 were governed by a six-month limitations period, not the six-year period approved in various appellate court decisions. Id. at 1313. The Seventh Circuit found significant that plaintiff had delayed filing suit in spite of the unsettled and conflicting case law prevalent when the cause of action arose. Id. at 1316
 
 
 [25]
 Our determination that the District Court's order in No. 86-5304 should be affirmed disposes of Clinton's appeal in No. 86-5387. See supra note 8